T.C. Memo. 1998-232


UNITED STATES TAX COURT


LAIDLAW TRANSPORTATION, INC. AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LAIDLAW INDUSTRIES, INC. & SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9361-94, 9362-94.          Filed June 30, 1998.


<u>Robert H. Aland</u>, <u>Gregg D. Lemein</u>, <u>Mark A. Oates</u>, <u>Jeffrey M. O'Donnell</u>, <u>John D. McDonald</u>, and <u>Taylor S. Reid</u>, for petitioners.

<u>Thomas R. Lamons</u>, <u>C. Glenn McLoughlin</u>, and <u>Brigham J.L. Sanders</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>: Respondent determined deficiencies in and overpayments of petitioners' Federal income tax as follows:

<u>Laidlaw Transportation, Inc. (LTI) and Subsidiaries</u>

| Year | Deficiency | Overpayment |
|------|-----------|-------------|
| 1984 | $108,575 | $8,333 |
| 1985 | 3,178,717 | 0 |
| 1987 | 7,983,733 | 0 |
| 1988 | 17,747,370 | 181,801 |

<u>Laidlaw Industries, Inc. (LII) and Subsidiaries</u>

| Year | Deficiency | Overpayment |
|------|-----------|-------------|
| 1986 | $96,383 | -0- |
| Aug. 1987 | 19,746,061 | -0- |
| Dec. 1987 | 6,828,291 | -0- |

Petitioners received $975,153,806 from a related Dutch corporation, Laidlaw International Investments B.V. (LIIBV), during the years in issue. Petitioners transferred $133,515,459[1] to LIIBV in payments denominated as interest[2] during those years. The issue for decision is whether the LIIBV advances to petitioners were debt or equity, and thus whether petitioners may deduct the $133,515,459 as interest for the years in issue. We

---

[1] The following payments from LTI's and LII's subsidiaries to LIIBV are in dispute:

| | Payments to LIIBV from -- | | |
|---------|-----------|-----------|-------|
| Tax Year | LTI's Subsidiaries | LII's Subsidiaries | Total |
| Aug. 31, 1986 | $2,439,773 | $753,698 | $3,193,471 |
| Aug. 31, 1987 | 17,199,562 | 28,590,158 | 45,789,720 |
| Dec. 31, 1987 | --- | 14,509,081 | 14,509,081 |
| Aug. 31, 1988 | 70,023,187 | --- | 70,023,187 |
| Total | 89,662,522 | 43,852,937 | 133,515,459 |

[2] Our use of terms such as "pay", "payment", "borrow", "interest", "lend", and "loan" does not indicate our conclusion about the substance of the transactions at issue.

hold that the LIIBV advances to petitioners were equity, and that petitioners may not deduct the $133,515,459 as interest.[3]

We use the following abbreviations in this report:

| | | | |
|---|---|---|---|
| BBC | Barclays Bank of Canada | LIIBV Curacao | Laidlaw International Investments B.V., Curacao Branch |
| BFI | Browning-Ferris Industries, Inc. | LIL | Laidlaw Investments Ltd. |
| Chase | Chase Lincoln First Bank | LTI | Laidlaw Transportation, Inc. |
| CP | Canadian Pacific Ltd. | LTL | Laidlaw Transportation Ltd. or Laidlaw, Inc. |
| FNBC | First National Bank of Chicago | LWSI | Laidlaw Waste Systems, Inc. |
| GGCL | Grey Goose Corporation Ltd. | LWSL | Laidlaw Waste Systems, Ltd. |
| Goose | Grey Goose Holdings, Inc. | Monroe | Monroe Tree and Lawntender, Inc. |
| GSX | GSX Corporation | RBC | Royal Bank of Canada |
| LAC | Laidlaw Acquisition Corp. | TDB | Toronto Dominion Bank |
| LESCAL | Laidlaw Environmental Services (California), Inc. | Transit | Travelways, Inc., Laidlaw Transit, Inc., or Laidlaw Transit (West), Inc. |
| LESI | Laidlaw Environmental Services, Inc. | Transit Ltd. | Laidlaw Transit Ltd. |
| LHI | Laidlaw Holdings, Inc. | Tree | Laidlaw Tree Service, Inc. |
| LIBL | Laidlaw Investments (Barbados) Ltd. | Waste Quebec | Laidlaw Waste Systems Quebec Ltd. |
| LII | Laidlaw Industries, Inc. | WMI | Waste Management, Inc. |
| LIIBV | Laidlaw International Investments B.V. | | |

---

[3] In light of our decision, we need not decide whether, as respondent contends, some of the payments at issue here are not deductible because of sec. 267.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue and Rule references are to the Tax Court Rules of Practice and Procedure.

TABLE OF CONTENTS

I.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . 4

     A.   Petitioners . . . . . . . . . . . . . . . . . . . . 4
     B.   LTL . . . . . . . . . . . . . . . . . . . . . . . . 5
     C.   Growth of Petitioners and Their Subsidiaries  . . . 11
     D.   LIIBV . . . . . . . . . . . . . . . . . . . . . . . 15
     E.   LTL's Purchase of GSX . . . . . . . . . . . . . . . 20
     F.   LTI's Centralized Cash Management Program (CCMP)  . 24
     G.   The Advances at Issue . . . . . . . . . . . . . . . 25
     H.   Petitioners' Financial Condition  . . . . . . . . . 44
     I.   Bank Loans  . . . . . . . . . . . . . . . . . . . . 48
     J.   Comparison of Terms Governing Advances from LIIBV and
          Bank Loans  . . . . . . . . . . . . . . . . . . . . 50
     K.   Audit of LTL by Canadian Tax Authorities. . . . . . 52

II.  OPINION  . . . . . . . . . . . . . . . . . . . . . . . . . 52

     A.   Contentions of the Parties  . . . . . . . . . . . . 52
     B.   Loans vs. Capital Contributions . . . . . . . . . . 53
     C.   Substance vs. Form  . . . . . . . . . . . . . . . . 54
     D.   The Mixon Factors . . . . . . . . . . . . . . . . . 58
     E.   Other Factors . . . . . . . . . . . . . . . . . . . 81
     F.   Conclusion  . . . . . . . . . . . . . . . . . . . . 83

I.  FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioners

Petitioners LTI and LII are U.S. corporations the principal places of business of which were in Hurst, Texas, when they filed their petitions.

LTL, a Canadian corporation, owned all of the stock of LTI during the years in issue.  LTI was a holding company for U.S.

companies in the passenger and school bus transportation businesses. LTI's consolidated group included Transit and Tree.

LTI owned 76 to 79 percent of the stock of LII during the years in issue and before December 16, 1987. The other LII stock was publicly held. LII bought the publicly held stock on December 16, 1987. After that date, LTI was the parent of the U.S. consolidated group that included LII. LII was a holding company for U.S. companies in the solid and (after October 1986) hazardous waste services business, including LWSI.

B. LTL

1. Michael George DeGroote (DeGroote)

DeGroote and his family moved from Belgium to Canada in 1948 when he was 14. In the 1950's, DeGroote started a construction business in Elliot Lake, Canada. In 1959, he moved his business to Sault Sainte Marie, Canada, and built sewers, roads, and highways.

In 1959, DeGroote bought all of the stock of Laidlaw Motor Sales, Ltd., an Ontario, Canada, trucking corporation; Laidlaw Motors, a retail truck parts business; and Hepburn Transport Ltd., a Canadian trucking company. In 1966, Hepburn Transport Ltd. merged with Laidlaw Motor Sales, Ltd., which later became LTL.[4] DeGroote was president and chairman of LTL from the time it was formed until August 1, 1990.

---

[4] On Jan. 1, 1990, LTL changed its name to Laidlaw Inc.

2. <u>Organization of the Laidlaw Entities in the Years in Issue</u>

As discussed in more detail in pars. I-B-3 and 4 and I-C, below, LTL and its subsidiaries were organized as follows during the years in issue:

a.    Laidlaw Entities Before December 16, 1987



<hr>

[5] GGCL owned all of Goose during the tax years ending Aug. 31, 1986, to Aug. 31, 1988.  LTL owned 96 percent and Transit Ltd. owned 4 percent of GGCL.  LTL owned all of Transit Ltd., a Canadian corporation.  On July 4, 1988, Transit Ltd. merged with Travelways Ltd., a Canadian corporation which was 100-percent owned by LTL.  The merged entity was Transit Ltd.

b.   Laidlaw Entities After December 16, 1987



3.   <u>Growth of LTL</u>

From 1959 to 1969, LTL and its predecessors bought trucking businesses in the United States and Canada.  LTL bought Superior Sanitation in 1969.  LTL began to buy passenger bus service businesses in Canada in 1973.  LTL's subsidiaries entered the solid waste services business in the United States in January 1978.  LTL bought the largest operator of school buses in Canada in 1979.  In October 1980, LTL bought all of the stock of Theta Systems, Inc. (TSI), which operated solid waste services businesses in Indiana, Illinois, and Ohio.  TSI changed its name to LWSI.  LWSI had subsidiaries active in the solid waste business in North America.

LTL's subsidiaries entered the passenger bus business in the United States in September 1983.  LTL sold its trucking business in 1984.  By the end of 1988, LTL and its subsidiaries were the third largest solid and hazardous waste management services company and the largest provider of school bus transportation services in North America.

LTL financed its expansion in the United States by lending money and contributing capital to its subsidiaries in the United States.  Before 1969, LTL financed its growth primarily with its own earnings and loans from banks and finance companies.  LTL first made a public offering of its stock in 1969.  LTL raised

C$1.5 million[6] in 1969, which it used to repay bank debts and buy more businesses. LTL stock was traded on stock exchanges in Canada and the United States by August 31, 1988 (the end of LTL's 1988 tax year).

LTL and its subsidiaries grew rapidly before and during the years in issue. DeGroote acquired businesses that provided trucking, solid waste services, and passenger and school bus services. These businesses used heavy vehicles to transport materials or people and needed governmental licenses or permits to operate. DeGroote believed that the fastest way to expand in these businesses was to buy small privately-held businesses which had existing licenses and permits.

4.    LTL's Management Team

The core management team of the Laidlaw entities during the years in issue consisted of DeGroote, Leslie W. Haworth (Haworth), and Ivan R. Cairns (Cairns). Haworth became LTL's senior financial officer in 1972 and later became senior vice president for finance. Cairns became LTL's vice president, general counsel, and secretary in 1981. He later became senior vice president. Cairns and Haworth were DeGroote's two closest advisors on acquisitions, financing, and other matters. They were directors and officers of LTL and all of its subsidiaries relevant to these cases before and during the years in issue.

---

[6] All references to "C$" are to Canadian dollars. All references to "$" are to U.S. dollars.

During the years in issue, DeGroote was chairman of all of the Laidlaw companies. DeGroote, Haworth, and Cairns were directors and officers of LTL, LIL (LIIBV's parent which was wholly owned by LTL), LIIBV, and petitioners.

### 5. DeGroote's Sale of LTL Stock

DeGroote owned about 50.5 percent of the voting stock of LTL during LTL's 1986 and 1987 tax years and until May 1988. Ownership of LTL's other voting stock was widely dispersed. In May 1988, CP, a Canadian transportation conglomerate, bought 47.2 percent of the voting stock of LTL from DeGroote for C$499 million.

## C. Growth of Petitioners and Their Subsidiaries

DeGroote and his management team established LTL as the controlling parent of several subsidiaries which included LIIBV, LTI, LII, and their subsidiaries. See pars. I-B-2, 3, and 4, above.

### 1. LTI and Its Subsidiaries

In 1977, LTL formed LTI (a petitioner in these cases) to be a holding company for LTL's U.S. subsidiaries. LTI, a Delaware corporation, is an accrual basis taxpayer. LTL owned all of the stock of LTI during the years in issue. LTI was the parent of an affiliated group that filed consolidated returns during the years in issue.

During the years in issue, DeGroote, Haworth, Ronald S. Murray (Murray), and Douglas R. Gowland (Gowland) were the

directors of LTI.  DeGroote was president from November 20, 1984, to December 10, 1987.  Murray was vice president from November 30, 1984, to January 9, 1986.  Haworth was vice president for finance from November 30, 1984, to August 31, 1988.  Cairns was secretary from November 30, 1984, to December 10, 1987.  Gowland was senior vice president for solid waste services from December 11, 1986, to December 10, 1987.

DeGroote, Haworth, and Gowland were directors of Tree from May 27, 1987, to August 31, 1988.  Officers of Tree from May 27, 1987, to August 31, 1988, included Gowland as chairman, Haworth as vice president for finance, and Cairns as secretary.[7]

DeGroote, Haworth, and Victor A. Webster (Webster) were Transit's directors from January 10, 1985, to August 31, 1988.  Transit's officers from January 10, 1985, to August 31, 1988, included Webster as president, Haworth as vice president for finance, and Cairns as secretary.  DeGroote was chief executive officer from December 10, 1987, to August 31, 1988.

Through an acquisition company, on May 1, 1987, LTI paid $16 million to buy the stock of Monroe, a New York corporation, which provided landscaping and tree services in New England.  Monroe changed its name to Laidlaw Tree Services, Inc. (Tree), on April 28, 1988.

---

[7] LTI sold all of the outstanding stock of Tree to an unrelated buyer in October 1990 for $17.4 million.

On October 28, 1983, LTL formed Travelways, Inc. (Travelways), a Delaware holding and operating corporation. Before September 1, 1987, Travelways owned all of Transit, a holding and operating corporation formed under California law on June 26, 1961, and all of LTI's passenger services subsidiaries.

On September 1, 1987, Laidlaw Transit, Inc., changed its name to Laidlaw Transit (West) Inc. (LTW). On November 5, 1987, Travelways changed its name to Laidlaw Transit, Inc. (Transit).[8] After the name changes, most of the Laidlaw U.S. east coast passenger services subsidiaries were merged into Transit, and most of the Laidlaw U.S. west coast passenger services subsidiaries were merged into LTW.

During the years in issue, Transit and its subsidiaries provided passenger and school bus services in the United States. LTL and its subsidiaries were the largest provider of school transportation services in North America.

2.   LII and Its Subsidiaries

a.   LII

LTL formed LII (a petitioner in these cases) on March 24, 1981, as the holding company for LTL's U.S. and Canadian solid waste services operations. LII is a Delaware corporation and an accrual basis taxpayer. Before 1982, LTI owned 80 percent of the

---

[8] Unless otherwise indicated, references to "Transit" include references to Travelways, Laidlaw Transit, Inc., Laidlaw Transit (West), Inc., and Transit.

stock of LII.  LTL owned all of the stock of GGCL, a subsidiary of which owned the other 20 percent of LII stock.

On February 9, 1982, LTI and GGCL transferred their LII stock to LHI, a Delaware corporation.  The stock of LII was publicly traded on the NASDAQ from 1982 to 1987.  The public owned 19 to 24 percent of the stock of LII from 1982 to 1987.

During the years in issue, DeGroote, Haworth, Gowland, and Murray (and others) were directors of LII.  LII's presidents were Murray from September 1 to October 8, 1985, and Gowland from October 9, 1985, to August 31, 1988.  Haworth was vice president for finance from September 1, 1987, to August 31, 1988.  Cairns was secretary, vice president, and general counsel from September 1, 1985, to August 31, 1988.  Harve A. Ferrill (Ferrill) was a director of LII from 1982 to 1987.  Ferrill had founded a waste services company (TSI) that LTL bought in 1980.  When LII went public in 1982, DeGroote asked Ferrill to be a director.

LHI merged into LII on December 31, 1987.

b.  LWSI

LII owned all of the stock of LWSI during the years in issue.  During the years in issue, LWSI owned all of the common stock of LWSL, a Canadian corporation.  LWSL owned all of the common stock of Waste Quebec, a Canadian corporation.  LWSL and Waste Quebec were in the solid waste services business in Canada.

LWSI's only directors from September 1, 1985, to August 31, 1988, were DeGroote, Gowland, and Haworth. LWSI's officers included Gowland as president from October 2, 1986, to January 5, 1987, Haworth as vice president for finance from October 2, 1986, to August 31, 1988, and Cairns as secretary from September 1, 1985, to August 31, 1988.

D. LIIBV

1. Coopers & Lybrand's Plan

By the mid-1980's petitioners were competing intensely with WMI and BFI to buy solid waste services businesses. In the summer of 1985, DeGroote, Cairns, and Haworth asked Coopers & Lybrand to develop a tax strategy for LTL to help petitioners compete with WMI and BFI in buying U.S. companies. Coopers & Lybrand also considered nontax factors.

Coopers & Lybrand recommended that LTL form LIL as a wholly-owned Canadian subsidiary, and then form LIIBV, a Netherlands subsidiary of LIL to be funded by capital contributions and non-interest-bearing debt. Coopers & Lybrand said that under this plan: (a) LTL could deduct interest it paid on funds it borrowed to invest in LIL; (b) LIL could lend funds interest free to LIIBV, which could advance funds to Laidlaw's U.S. subsidiaries as interest-bearing debt; (c) the U.S. subsidiaries could deduct the interest with no withholding tax liability under a U.S./Netherlands treaty; and (d) the Laidlaw group would have what Coopers & Lybrand called a "double deduction" of interest expense (interest deduction in both Canada and the U.S.), with

minimal income tax liabilities in The Netherlands, Canada, or the United States.

### 2. Formation of LIL and LIIBV; Dutch Tax Rulings

On September 25, 1985, LTL formed LIL, a Canadian corporation. LTL has always been the sole shareholder of LIL.[9] LTL and its subsidiaries contributed equity to LIL which was its sole source of funds during the years in issue.[10]

DeGroote, Haworth, and Cairns were directors of LIL from September 25, 1985, to August 31, 1988. From September 25, 1985, to August 31, 1988, DeGroote was president and Haworth was vice president for finance. Cairns was vice president and secretary from September 25, 1985, to December 10, 1987, and secretary from December 10, 1987, to August 31, 1988. Jerry Pekaruk (Pekaruk) was controller from September 25, 1985, to December 10, 1987. Robert E. Duncan (Duncan) was vice president from December 10, 1987, to August 31, 1988. Haworth supervised Pekaruk and Duncan.

On December 2, 1985, Coopers & Lybrand received the first of several Dutch tax rulings that LIL's interest-free loans to LIIBV would be treated as capital contributions rather than profits for purposes of Dutch income and withholding taxes.

On December 30, 1985, LIL formed LIIBV in The Netherlands as a 100-percent owned subsidiary. LIIBV was a corporation for U.S.

---

[9] From the time LIL was formed, LIL owned all of the stock of LIBL, a Barbados corporation.

[10] LIL also received a dividend from LIIBV in February 1988.

Federal income tax purposes.[11]  In February 1986, LIIBV opened accounts with ABN Bank, New York.

LIL owned all of the stock of LIIBV during the years in issue.  DeGroote was a director of LIIBV during the years in issue.  LIIBV had other directors, including Netherlands residents.  Haworth became a director of LIIBV after the years in issue.

On October 16, 1986, Haworth (using LTI letterhead) wrote the following to Peter Deege, a director of LIIBV:

> I should advise you that at our Monday meetings we wish to do the following:
>
> 1.    Amend the loan agreements from B.V. to our U.S. subsidiaries to provide with effect from September 1, 1986:
>
> > (a)   All sums to be due on demand at interest rates equal to ABN New York prime plus 2 percent, payable on the last business days of each fiscal quarter.
> >
> > (b)   Remove all financial ratio covenants.
> >
> > (c)   Remove the "ceilings" so that no limits will exist.  All loans will be provided as requested but subjected to availabilities of B.V.'s funds.
> >
> > (d)   In the case of Laidlaw Transportation, Inc.'s subsidiaries, there will be two loan accounts established, one called principal account and the other called reinvested interest account.
> >
> > (e)   To facilitate the quarterly and other changes in loan amounts, all increases/decreases would be entered on a grid promissory note. This system allows the lender to adjust the promissory note automatically without issuing

---

[11] During the taxable years in issue, LIIBV was a foreign-related person with respect to Transit and LWSI within the meaning of sec. 267(a)(3) and sec. 1.267(a)-3(b)(1), Income Tax Regs.

a new note.  It may not be available under Dutch law in which case we shall amend to suit your requirements.

I shall be bringing new loan agreements with me prepared on the Grid Note Basis.

2.  Laidlaw Investments Limited ("LIL"), LIIBV's parent, will sell a promissory note of U.S. $124,812,613 payable by Laidlaw Waste Systems Inc. at ABN prime plus 2 percent to LIIBV in exchange for a combination of capital of LIIBV and an interest free loan.  The amount of capital that will be attributed to one share has to be determined by you and Ron Unger prior to Monday.  This promissory note is dated October 14 and LIIBV will have to direct the borrower to pay the interest accrued from October 14 to October 19 to LIL.

Ron Unger may need to advise the Dutch tax authorities of these transactions in advance.  Please confer with him.

LIIBV carried out the instructions in Haworth's letter at its board meeting on October 20, 1986.

From February 4, 1986, to April 12, 1988, LIIBV's managing directors met 12 times.  DeGroote was present at four of the meetings and voted by proxy at eight.  Haworth was present at three of those meetings and Cairns was present at two.

LIL owned 100 percent of LIIBV.  LIL's proxies at shareholder meetings for LIIBV included specific instructions about future transactions.

Cairns and Haworth signed all of the loan agreements, promissory notes, and assignments of transactions between LIIBV and petitioners on behalf of petitioners.  LTL significantly influenced LIIBV's lending decisions and operations.

3.   <u>LIIBV's Tax Status in The Netherlands</u>

LIIBV kept books in The Netherlands in which it recorded its lending and borrowing transactions, investments, capital contributions, income, and expenses.  LIIBV reported the payments on its loans to Transit, LWSI, and Tree as interest income subject to The Netherlands' income tax.  LIIBV paid income tax to The Netherlands in 1986, 1987, and 1988.

LIIBV could claim benefits under the Convention for the Avoidance of Double Taxation, Apr. 29, 1948, U.S.-Netherlands, art. VIII(1), 62 Stat. 1778, for all of the interest paid to it by U.S. persons, including petitioners.

Neither LTL nor any of the other Laidlaw companies asked to borrow money from any unrelated commercial lenders to replace the money the Laidlaw companies received from LIIBV.  LTL did not guarantee repayment of loans LIIBV made to petitioners or the U.S. companies.  However, LTL guaranteed repayment of loans by commercial lenders to petitioners and the U.S. companies.

4.   <u>LIIBV Curaçao</u>

In October 1987, LIIBV established a branch office in Curaçao, Netherlands Antilles (LIIBV Curaçao), to reduce Netherlands income tax on the interest payments that LIIBV received from Transit, LWSI, and Tree.  LIIBV Curaçao kept a set of its books and records in Netherlands Antilles.

On February 17, 1988, LIIBV Curaçao hired G.A.F. Schrils (Schrils), a resident of Netherlands Antilles, as its branch manager.  Schrils reported to LIIBV's directors in Amsterdam.

E.    LTL's Purchase of GSX

     1.    The Agreement To Buy GSX

LTL bought the stock of GSX for $349,812,613 in 1986.[12]
DeGroote and Haworth asked three investment banks if they wanted
to provide long-term financing for LII to buy GSX.  Dean Witter,
Bear Stearns, and Donaldson, Lufkin & Jenrette each gave LII
tentative proposals.  Each investment bank said that the GSX
acquisition could be financed through a combination of equity (or
convertible debt), subordinated debt, and bank loans.  The
investment banks based their proposals in part on information
about GSX's finances that LTL later found to be unreliable.  Each
proposal would have required petitioners to publicly issue stock
or debt.  However, petitioners could not issue equity or debt
because GSX did not have separate audited financial statements.
Haworth opposed a public offering at that time.

     LTL and LII rejected the investment banks' proposals
because:  (a) GSX did not have separate audited financial
statements; (b) equity or convertible debt would dilute LTI's
interests in LII; and (c) debt from commercial lenders could not
be secured on terms as favorable as debt from LIIBV.

     Ferrill (identified at par. I-C-2-a, above) was a member of
a special committee for LII's board of directors which was
considering the investment banks' proposals.  He relied on
Haworth's judgment in deciding that LII should reject the

---

     [12] GSX's parent had agreed to reduce the price by
C$24,743,000 because Coopers & Lybrand identified problems with
GSX's operations.

investment banks' proposals and use funds from LIIBV to pay for GSX.

LTL assigned its rights and obligations under the GSX purchase agreement to LWSI before the closing date. LTL and LTI recorded the transaction on their books as an intercompany receivable owed to LTL by LTI. LTI recorded the transaction as an intercompany receivable owed by LWSI.

LTL borrowed $349,812,613 from TDB on September 30, 1986, and on October 10, 1986, deposited it in a GSX purchase escrow account. In a document entitled "Loan Agreement" signed by Cairns and dated as of September 30, 1986, LTL agreed to many conditions for the loan that typically accompany commercial loans, including not to allow its ratio of current assets to current liabilities to be less than 1 to 1, its debt to equity ratio[13] to be greater than 2.5 to 1, its cash-flow ratio[14] to be less than 1.25 to 1, and its net worth to be less than C$325 million.

On October 10, 1986, LWSI wrote promissory notes payable to LTI on demand for $124,812,613, $125 million, and $100 million (a total of $349,812,613). Each promissory note required LWSI to

---

[13] Debt to equity ratio is computed by dividing the debt of a company by its shareholders' equity. The ratio indicates the level of financing that is provided by the company's shareholders and its creditors.

[14] Cash-flow ratio is computed by dividing cash-flow by anticipated debt payments.

pay LTI interest quarterly at a rate equal to ABN Bank's U.S. prime rate plus 2 percent.

On October 14, 1986, LWSI bought all of the stock of GSX from GSX's parent for $349,812,613.  On October 14, 1986, the GSX purchase escrow disbursed $349,812,613 to GSX's parent and gave the three LWSI promissory notes to LTI.  After the GSX sale, LTI owed LTL $349,812,613 (which was unsecured) with interest at a rate equal to the U.S. prime rate.

On October 20, 1986, LWSI's $124,812,613 promissory note was assigned to LTL, then to Transit, then to LIL, and then to LIIBV. In exchange for this assignment, LIIBV executed a promissory note to LIL for an interest-free loan from LIL in the same amount as the assigned note.  On November 10, 1986, LWSI's $125 million promissory note was assigned to LIIBV.  Haworth and Cairns signed the documents through which the notes were assigned.

On December 10, 1986, LWSI told LIIBV that LWSI could not lower its debt to equity ratios to a level acceptable to ABN Bank by issuing equity.  This was partly because the equity market was weak at that time.

LIIBV transferred to LWSI $21 million on February 18, 1987, and $79 million on June 15, 1987.  LWSI used these funds to repay LTI for the $100 million promissory note.

Initially LTL, and later LIIBV, financed LWSI's acquisition of GSX.  As part of that initial financing LTL and LIIBV required LWSI to pay interest at a rate of 10.5 percent on the amount

LIIBV advanced to it. LII's directors, including Ferrill, approved the intercompany financing to buy GSX because the rates and terms were more favorable to LII than those from commercial lenders. On July 7, 1987, LII and LWSI signed a new loan agreement with LIIBV. It included balances from previous advances and kept the 10.5 percent interest rate.

LTL repaid its loan from TDB relating to the GSX acquisition primarily with money that LTL raised in equity markets.

2. Result of the GSX Purchase

The GSX purchase made LII the third largest solid waste services business in the United States and the second or third largest provider of hazardous waste disposal services in the United States.

LII's credit lines from commercial lenders limited LII's debt to equity ratio to no more than 2 to 1. As a result, LII's debt under these lines of credit could not exceed $247.8 million. LII's debt after the GSX acquisition was $491.1 million. If LII's debt to equity ratio exceeded 2 to 1, it would be required to renegotiate its commercial loans. The debt from the GSX acquisition made it harder for LII to meet the financial ratio requirements established by credit agreements with its commercial lenders. Before acquiring GSX, LII's debt to equity ratio (based on book value) was less than 1 to 1; after the acquisition, it was almost 3.1 to 1. LII's primary competitors in the U.S. solid waste services industry had debt to equity ratios below 2 to 1.

3.  LESI

GSX changed its name to LESI.  LESI became an indirect subsidiary of LWSI in October 1986.  LESI was the holding company for the hazardous waste services operating subsidiaries of the LII group.

On April 11, 1989, LESI and International Technologies Corp., an unrelated U.S. corporation, formed LESCAL.  LESI owned 70 percent of LESCAL and International Technologies Corp. owned 30 percent.  On March 31, 1993, LESI bought International Technologies Corp.'s stock in LESCAL.

F.  LTI's Centralized Cash Management Program (CCMP)

Before 1987, LTI had a program with its subsidiaries to manage cash called the CCMP.  The CCMP had the following accounts.  LTI had an account called a master concentration account or first tier account.  Transit, Tree, and LWSI, LTI's subsidiaries one level below LTI, had second tier concentration accounts.  Regions of Transit, Tree, and LWSI had third tier concentration accounts.  Operating companies in those regions had fourth tier concentration accounts.

The CCMP accounts operated as follows.  At the end of each day, each operating company netted the cash it received against the cash it disbursed.  The operating company netted the cash in a general account.  The operating company then transferred any extra cash in the general account to the appropriate third tier account.  If there was a cash shortage in the operating company's

general account, cash was transferred from the appropriate third tier account to the operating company's fourth tier account. All fourth tier accounts were zeroed out at the end of the day. Next, the same thing was done for third and then second tier accounts. Each second tier account was zeroed out with transfers to or from the first tier master account. The parties to the CCMP accounted for the transfers between the accounts as intercompany receivables or payables. The parties to the CCMP charged what they claim to be interest on all intercompany payables established under the CCMP.

In July 1987, LTI, Transit, LWSI, and Tree established a unified CCMP at FNBC. In 1987 and 1988, LTI's CCMP overdraft limit was between $25 and $30 million for its master concentration account at FNBC.

LTL summarized the transfers of money to be made through FNBC's accounts for FNBC officials in Canada. At the end of each day, LTL or its subsidiaries redeposited enough money in the FNBC CCMP accounts to cover any overdrafts resulting from transfers.

LII had a separate CCMP with its subsidiaries.

G.  The Advances at Issue

1.  LIL, LIIBV, and LTL

In the years in issue, LIIBV's primary activity was to receive funds from LIL and transfer them to petitioners, generally on the same or next day. LIIBV advanced funds only to Laidlaw affiliates in the years in issue. LIIBV's funds came almost exclusively from LIL and from petitioners' payments to LIIBV.

When a Laidlaw entity asked for an advance, LIIBV asked LIL to provide funds for the transaction. When LIL advanced those funds to LIIBV, LIL told LIIBV to record the advance as an interest-free loan and as a capital contribution, in proportions designated by LIIBV and Coopers & Lybrand. This was done in part to comply with Dutch tax rulings.

Written agreements between LIL and LIIBV generally required LIL to provide funds requested by LIIBV, as long as those amounts were no more than amounts that LIIBV agreed to advance to petitioners or their subsidiaries. LIIBV agreed to repay advances from LIL on demand. LIIBV's managing directors issued more stock to LIL as needed to make LIIBV's debt to equity ratio comply with Dutch tax rulings.

2.  Advances at Issue

LIIBV transferred the following amounts of money to Transit, LWSI, and Tree during the years in issue:

| DATE | LIIBV Advances To -- | | | TOTAL | CUMULATIVE BALANCE |
|------|----------|------------|------|-------|-----------|
|      | TRANSIT | LWSI | TREE | | |
| 12/18/85 | $5,000,000 | -0- | -0- | $5,000,000 | $5,000,000 |
| 02/18/86 | 18,000,000 | -0- | -0- | 18,000,000 | 23,000,000 |
| 04/29/86 | 30,100,000 | $29,000,000 | -0- | 59,100,000 | 82,100,000 |
| 05/29/86 | 9,588,797 | -0- | -0- | 9,588,797 | 91,688,797 |
| 08/06/86 | 54,000,000 | -0- | -0- | 54,000,000 | 145,688,797 |
| 08/28/86 | 2,204,674 | -0- | -0- | 2,204,674 | 147,893,471 |
| Total FY1986 | 118,893,471 | 29,000,000 | -0- | 147,893,471 | |
| | | | | | |
| 10/20/86 | -0- | 124,812,613 | -0- | 124,812,613 | 272,706,084 |
| 11/10/86 | 43,800,000 | 125,000,000 | -0- | 168,800,000 | 441,506,084 |
| 11/25/86 | 5,870,270 | -0- | -0- | 5,870,270 | 447,376,354 |

| DATE | LIIBV Advances To -- | | | TOTAL | CUMULATIVE BALANCE |
| | TRANSIT | LWSI | TREE | | |
|---|---|---|---|---|---|
| 02/18/87 | -0- | 21,000,000 | -0- | 21,000,000 | 468,376,354 |
| 02/25/87 | 11,535,627 | -0- | -0- | 11,535,627 | 479,911,981 |
| 05/28/87 | 12,468,151 | 6,400,000 | $20,000,000 | 38,868,151 | 518,780,132 |
| 06/15/87 | -0- | 99,000,000 | -0- | 99,000,000 | 617,780,132 |
| 08/31/87 | 15,280,674 | -0- | -0- | 15,280,674 | 633,060,806 |
| Total FY1987 | 88,954,722 | 376,212,613 | 20,000,000 | 485,167,335 | |
| | | | | | |
| 11/30/87 | 16,700,000 | -0- | -0- | 16,700,000 | 649,760,806 |
| 12/16/87 | -0- | 60,900,000 | -0- | 60,900,000 | 710,660,806 |
| 02/08/88 | 45,000,000 | -0- | -0- | 45,000,000 | 755,660,806 |
| 02/29/88 | -0- | 90,448,000 | -0- | 90,448,000 | 846,108,806 |
| 04/18/88 | 17,000,000 | 11,000,000 | -0- | 28,000,000 | 874,108,806 |
| 04/29/88 | -0- | 10,000,000 | -0- | 10,000,000 | 884,108,806 |
| 05/31/88 | -0- | 21,045,000 | -0- | 21,045,000 | 905,153,806 |
| 08/08/88 | 31,000,000 | 17,000,000 | -0- | 48,000,000 | 953,153,806 |
| 08/31/88 | -0- | 22,000,000 | -0- | 22,000,000 | 975,153,806 |
| Total FY1988 | 109,700,000 | 232,393,000 | -0- | 342,093,000 | |

LIIBV continued to advance money to LTI, Transit, LWSI, Tree, and other LTI subsidiaries after August 31, 1988.  By December 31, 1994, LIIBV had advanced $1,393,383,974 to petitioners.

3.    Typical Advances From LTL to LIIBV and From LIIBV to Petitioners

    a.    Typical Advance From LTL to LIIBV to Transit

LIIBV's February 18, 1986, advance to Transit typified how LIIBV received funds from LIL and immediately advanced the funds to one of the petitioners.  The steps for the February 18, 1986, advance were as follows:

Steps for the February 18, 1986, Transfers

1.    LTL received $18 million from its August 1985 issue of preferred shares.
2.    LTL transferred $18 million to LIL.  LIL issued stock to LTL.
3.    LIL transferred $18 million to LIIBV.
4.    LIIBV transferred $18 million to Transit.

    b.    Transfers Between U.S. Subsidiaries and LIIBV

The following descriptions show in greater detail how petitioners and LIIBV (including LIIBV Curaçao) transferred funds during the years in issue:

August 28, 1986, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| LII for LWSI | $573,958 | LWSI | -0- |
| Transit | 1,630,716 | Transit | $2,204,674 |
| Total | 2,204,674 | Total | 2,204,674 |

Steps for the August 28, 1986, Transfers

1.    LII borrowed $573,958 from RBC for LWSI.
2.    LII transferred $573,958 to LIIBV for LWSI.
3.    Transit transferred $1,630,716 to LIIBV.
4.    LIIBV transferred $2,204,674 to Transit.

### November 25, 1986, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| Transit to LIIBV | $3,097,820 | LIIBV to Transit | $5,870,270 |
| LWSI to LIIBV | 2,772,451 | LIIBV to LWSI | -0- |
| Total | 5,870,271 | Total | 5,870,270 |

### Steps for the November 25, 1986, Transfers

1. LWSI transferred $2,772,451 to LIIBV.
2. Transit transferred $3,097,820 to LIIBV.
3. LIIBV transferred $5,870,270 to Transit.

### February 24-25, 1987, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| LWSI | $7,532,238 | LWSI | -0- |
| Transit | 4,003,389 | Transit | $11,535,627 |
| Total | 11,535,627 | Total | 11,535,627 |

### Steps for the February 24-25, 1987, Transfers

1. LTL authorized TDB to transfer $4,003,389 to Transit; the funds were transferred to LTI.
2. LTI transferred $4,003,389 to Transit.
3. Transit transferred $4,003,389 to LIIBV.
4. LWSI received $7,532,238 from RBC.
5. LWSI transferred $7,532,238 to LIIBV.
6. LIIBV transferred $11,535,627 to Transit.
7. Transit transferred $10,000,000 to LTI.

### May 28, 1987, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| Transit | $4,479,972 | Transit | $12,468,151 |
| LWSI | 7,988,179 | LWSI | -0- |
| Total | 12,468,151 | Total | 12,468,151 |

### Steps for the May 28, 1987, Transfers--Transaction 1

1. LWSI received loan proceeds of $7,988,179 from RBC.
2. RBC wired the funds to LIIBV.
3. Transit transferred $4,479,972 to LIIBV.
4. LIIBV transferred $12,468,151 to Transit.

## Steps for the May 28, 1987, Transfers--Transaction 2

1. LTL transferred $26,400,000 to LIL.
2. LIL transferred $26,400,000 to LIIBV.
3. LIIBV transferred $20,000,000 to LTI.
4. LIIBV transferred $6,400,000 to RBC on behalf of LWSI.
5. LTI transferred $20,200,000 to LWSI.
6. LWSI transferred $16,000,000 to Thomas Terry, Jr., to acquire Tree.
7. LWSI transferred $4,200,000 to Tree.

## August 31, 1987, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| Transit | $5,071,716 | Transit | $15,280,674 |
| LWSI | 10,297,291 | LWSI | -0- |
| LTI for Tree | 546,667 | LTI for Tree | -0- |
| Total | 15,915,674 | Total | 15,280,674 |

## Steps for the August 31, 1987, Transfers

1. LWSI transferred $6,000,000 to LTI.
2. LTI transferred $3,663,625 to LWSI.
3. LTI transferred $546,667 on Tree's behalf to LIIBV.
4. Transit transferred $5,071,716 to LIIBV.
5. LIIBV transferred $15,280,674 to Transit.
6. LWSI transferred $10,297,291 to LIIBV.
7. LTI transferred $12,790,221 to LWSI.
8. Transit transferred $7,448,587 to LTI.

## November 30, 1987, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| LTI for Tree | $549,028 | Tree | -0- |
| LTI for Transit | 5,705,723 | Transit | $16,700,000 |
| LTI for LWSI | 10,597,883 | LWSI | -0- |
| Total | 16,852,634 | Total | 16,700,000 |

## Steps for the November 30, 1987, Transfers

1. On Tree's behalf, LTI transferred $549,028 to LIIBV.
2. On Transit's behalf, LTI transferred $5,705,723 to LIIBV.
3. On LWSI's behalf, LTI transferred $10,597,883 to LIIBV.
4. LIIBV transferred $16,700,000 to Transit.
5. LTI received $82,624,902, $49,819,429 of which was from Transit.
6. LTI transferred $29,976,998 to LWSI.
7. LTI transferred $32,609,046 to Transit.

## February 29, 1988, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| LTI for LWSI | $11,991,976 | LWSI | $12,448,000 |
| LTI for Transit | 6,346,874 | Transit | -0- |
| Tree | 539,583 | Tree | -0- |
| Total | 18,878,433 | Total | 12,448,000 |

### Steps for the February 29, 1988, Transfers--Transaction 1

1. On behalf of LWSI, LTI transferred $11,991,976 to LIIBV.
2. On behalf of Transit, LTI transferred $4,591,927 to LIIBV.
3. On behalf of Transit, LTI transferred $1,754,947 to LIIBV Curaçao.
4. Tree transferred $539,583 to LIIBV.
5. LIIBV transferred $10,728,000 to LIIBV Curaçao.
6. LIIBV Curaçao transferred $12,448,000 to LWSI.
7. LIIBV transferred $2,000,000 to LIL.
8. LTI transferred $654,473 to Tree.
9. LWSI transferred $12,448,000 to LTI.

### Steps for the February 29, 1988, Transfers--Transaction 2

1. LTL received $13,000,000 from TDB.
2. RBC transferred $63,000,000 to LTL.
3. LTL transferred $78,000,000 to LIL.
4. LIL transferred $78,000,000 to LIIBV.
5. LIIBV transferred $78,000,000 to LWSI.
6. LTI transferred $15,096,068 to TDB.
7. LTI transferred $63,384,285 to RBC.
8. LWSI transferred $78,000,000 to LTI.

## May 31, 1988, Transfers

| U.S. Subsidiaries to LIIBV and LIIBV Curaçao | | LIIBV and LIIBV Curaçao to U.S. Subsidiaries | |
|---|---|---|---|
| Tree | $542,499 | Tree | -0- |
| LWSI | 15,015,471 | LWSI | $21,045,000 |
| Transit | 7,534,621 | Transit | -0- |
| Total | 23,092,591 | Total | 21,045,000 |

### Steps for the May 31, 1988, Transfers

1. LTI transferred $5,770,188 to Transit.
2. LTI transferred $14,677,818 to LWSI.
3. Tree transferred $542,499 to LIIBV.
4. LWSI transferred $14,677,818 to LIIBV.
5. LWSI transferred $337,653 to LIIBV Curaçao.
6. Transit transferred $5,770,188 to LIIBV.
7. Transit transferred $1,764,433 to LIIBV Curaçao.

8. LIIBV transferred $18,985,000 to LIIBV Curaçao.
9. LIIBV Curaçao transferred $21,045,000 to LWSI.
10. LIIBV transferred $2,000,000 to LIL.
11. LIL transferred $2,000,000 to Transit and affiliates.
12. Transit and affiliates transferred $2,000,000 to LTL.
13. LTL repaid $2,000,000 in long-term debt.
14. LTI transferred $783,381 to Tree.
15. LWSI transferred $8,794,145 to LTI.
16. Transit transferred $981,987 to LTI.

### August 31, 1988, Transfers

| U.S. Subsidiaries to LIIBV and LIIBV Curaçao | | LIIBV and LIIBV Curaçao to U.S. Subsidiaries | |
|---|---|---|---|
| Transit | $8,580,485 | Transit | -0- |
| LWSI | 16,546,460 | LWSI | $22,000,000 |
| Tree | 581,666 | Tree | -0- |
| Total | 25,708,611 | Total | 22,000,000 |

### Steps for the August 31, 1988 Transfers

1. FNBC transferred $2,900,000 to LTI.
2. LTI received $19,617,722. Transit and LWSI transferred funds to their respective general payables accounts with FNBC. From these accounts, $19,617,722 was transferred to LTI's FNBC master concentration account in an "Automatic Clearing House" transaction.
3. LTI transferred $22,261,038 to LIIBV as follows: $6,688,667 on Transit's behalf and $15,572,371 on LWSI's behalf.
4. Tree transferred $581,666 to LIIBV.
5. Transit transferred $1,891,818 to LIIBV Curaçao.
6. LWSI transferred $974,089 to LIIBV Curaçao.
7. LIIBV transferred $19,134,704 to LIIBV Curaçao.
8. LIIBV Curaçao transferred $22,000,000 to LWSI.
9. LWSI transferred $22,000,000 to LTI.
10. LTI transferred $17,900,000 to LWSI.
11. LTI transferred $35,000,000 to LII.
12. LWSI transferred $40,993,136 to LTI.
13. LTI transferred $278,419 to Tree.
14. LTI transferred $6,651,824 to Transit.

        c.    LTL's Description of an LIIBV Transfer

In 1986, RBC arranged for LTL to borrow funds for what RBC described as a "'double dip' taxation driven transaction". In that transaction, RBC's loans were repaid in the United States and new loans were made from Canada. LTL summarized the following steps of one of those fund transfers in a memorandum

relating to an advance on February 8, 1988, by LTL to LIIBV to Transit:

1.  LTL borrowed $45 million from TDB;
2.  LTL lent the funds to Transit Ltd. at the prime rate;
3.  Transit Ltd. contributed the funds to LIL for Class B shares;
4.  LIL advanced funds to LIIBV via ABN Bank (New York);
5.  LIIBV advanced funds to Transit Ltd. at prime plus 2 percent;
6.  Transit Ltd. paid down intercompany debt to LTI; and
7.  LTI paid $45 million.

####     d.    Advances to Transit

On November 10, 1986, Transit signed a demand note payable to LTI for $43.8 million.  Also on that day, the note was assigned to LTL, then to Transit, then to LIL, and then to LIIBV.  Haworth and Cairns signed each assignment.  The $43.8 million was incorporated into a loan agreement dated "as of September 1, 1986".

Transit acquired stock and assets of 44 companies in the transportation industry for $50,744,478 in the year ending August 1986, $20,736,304 in the year ending August 1987, and $71,573,421 in the year ending August 1988.  Transit used $24,798,393 from LIIBV for interest reinvestment loans.

####         e.    Advances to LWSI    LWSI used advances from LIIBV as follows:[15]  $349,812,613 to buy GSX; $6.4 million to repay RBC loans; $60.9 million to repurchase LII stock; and $43,553,907 to pay interest to LIIBV (interest reinvestment loans).

---

[15] LWSI transferred $29 million to its affiliate, Societe Sanitaire, to buy preferred stock in Travelways, Ltd.  However, it is not clear whether it used the $29 million it borrowed for that purpose.

LWSI bought stock and assets in 31 companies in the solid waste services industry for $5,384,708 in the year ending August 1986, $373,534,605 in the year ending August 1987, and $71,837,698 in the year ending August 1988, largely with advances from LIIBV.

### f.    Financing the LII Stock Repurchase

The public held 21 to 24 percent of LII's stock until December 16, 1987.  In December 1987, LII began to buy those publicly held shares through a tender offer totaling about $93 million ($22 per share).  Ferrill, a director of LII from 1982 to 1987, convinced DeGroote to increase the repurchase price for LII stock from $17-18 per share to $22 per share.  The trading price was $15.50 per share on November 9, 1987.  LII completed the repurchase on December 16, 1987.  LII became wholly owned by members of the LTL group.

On December 15, 1987, LTI signed a loan agreement with LIIBV which had the same terms as those in LIIBV's May 27 and July 7, 1987, agreements with Transit, LWSI, and Tree.  On December 16, 1987, LTI used a $60.9 million advance from LIIBV to pay for LII stock that LII had repurchased from the public.  On December 16, 1987, LWSI assumed LTI's obligations to LIIBV on the $60.9 million loan.

### g.    Financing the Purchase of Monroe

LAC borrowed $20 million from LIIBV pursuant to a loan agreement dated May 27, 1987.  LAC used the proceeds of the loan to buy Monroe ($16 million) and to refinance third-party loans

relating to Monroe's purchase of rolling stock ($4 million).  In October 1990, LTI sold Monroe, renamed Laidlaw Tree Services, Inc., to an unrelated party for $17.4 million.  At that time, LTI assumed Tree's obligation to repay $22.5 million to LIIBV, and Tree agreed to pay $22.5 million to LTI.

4.  <u>General Terms and Conditions of the LIIBV Agreements</u>

LTL's counsel, Cairns, wrote the first draft of all of the LIIBV loan agreements.  LIIBV and petitioners revised some of the agreements.

The loan agreements and promissory notes between LIIBV, Transit, LWSI, Tree, and LTI and LII as guarantors:  (a) Said that the borrower unconditionally promised to repay advances on a fixed date or on demand; (b) said that LTI guaranteed LIIBV that Transit and Tree would repay the advances, and LII guaranteed LIIBV that LWSI would repay the advances; (c) said that the borrower must pay a fixed or determinable rate of interest regardless of whether the borrower or guarantor had any income or distributed dividends; (d) said that LIIBV could require the borrower and the guarantor to pay principal and interest; (e) said that LIIBV's rights were senior to the rights of the equity holders of the nominal borrower and guarantor; (f) did not authorize LIIBV to convert the obligations into stock of the nominal borrower or the guarantor; (g) did not authorize LIIBV to participate in the management of the nominal borrower or the guarantor; (h) did not say that the nominal borrower's obligation to repay LIIBV was contingent; and (i) said that LIIBV could

transfer the advances to any person without regard to any transfer of stock of the borrower.

Petitioners and LIIBV treated the advances from LIIBV to Transit, LWSI, and Tree as loans on their financial statements. LIIBV could have sued, but did not, to enforce the agreements.

During the years in issue, LWSI and LWSL had credit lines from RBC and BBC totaling about $250 million, which were senior to LIIBV's and LTL's advances.

5.   Terms and Conditions of Specific LIIBV Agreements

    a.    Transit and LWSI Loan Agreements

LIIBV advanced $5 million to Transit on open account on December 18, 1985.  On February 4, 1986, Transit and its subsidiaries, and LTI as guarantor, signed a loan agreement with LIIBV which established a $50 million line of credit convertible to a 5-year term loan due on September 1, 1988.[16]  Transit agreed to pay interest quarterly beginning on May 31, 1986.  The agreement included an acceleration clause (i.e., the full amount advanced would be due if Transit defaulted).  Transit and LTI agreed that they would each would maintain a long-term debt to equity ratio of no more than 2 to 1 and a current assets to current liabilities ratio of no less than 1 to 1.

The agreement did not require the directors of Transit or LTI to adopt a resolution authorizing the guaranty or require the

---

[16] Loans to Transit under the Feb. 4, 1986, agreement were to mature on Sept. 1, 1988, unless the outstanding principal was previously converted into a term loan to be repaid in 10 semiannual installments.

borrower or guarantor to obtain legal opinions concerning enforceability of the guaranty.  The agreement did not require a covenant that the guaranty would rank no lower than that of all unsecured indebtedness of the guarantor.  The agreement required Transit to provide financial information concerning the guarantor only when requested.  On April 23, 1986, Transit and LTI as guarantor amended the February 4, 1986, loan agreement with LIIBV to increase the line of credit to $100 million and amended the interest rate provisions from a variable rate equal to the prime interest rate of the ABN Bank, New York, to a variable rate equal to the lower of the prime interest rate of the ABN Bank, New York, and the 60 day LIBOR interest rate plus ½ percent.

Also on April 23, 1986, LWSI and LII as guarantor signed a loan agreement with LIIBV for $50 million.  The terms were similar to the Transit agreement, as amended, but LWSI agreed to limit its debt to equity ratio to no more than 2.5 to 1.

On May 26, 1986, before the May 31, 1986, interest payment date, LIIBV amended its loan agreements with Transit and LWSI to modify the interest rates.

On August 6, 1986, LIIBV advanced $54 million to Transit for which Transit signed a demand note.

The loans to which LIIBV and petitioners agreed before September 1, 1986, did not require the borrowers to make periodic principal payments.  The agreements permitted Transit and LWSI to convert the agreements to term loans on or before the maturity date.  All of the pre-September 1986 LIIBV loans were payable on

September 1, 1988.  If Transit or LWSI chose to convert, the loans from LIIBV would become fixed-term loans repayable in 10 equal semiannual installments.  However, LIIBV could demand repayment at any time if it needed the funds.

After the GSX acquisition, LTI and LII did not comply with leverage ratios to which they had agreed in the loan agreements with TDB, RBC, and BBC.  On October 16, 1986, Haworth told LIIBV that LII's repayment of its advances must be subordinated to LII's commercial lenders.  Also on October 16, 1986, Haworth asked LIIBV to amend petitioners' loan agreements to provide, effective September 1, 1986, that (1) all sums would be due on demand at interest rates equal to the prime rate at ABN Bank, New York, plus 2 percent, (2) petitioners need not meet any financial ratios, (3) petitioners no longer had restrictions as to the maximum amount of funds they could seek and that LIIBV was to provide on request, subject to availability of funds, and (4) LIIBV would subordinate its advances to petitioners to their bank loans.  On October 20, 1986, LIIBV's managing board unanimously agreed to subordinate repayment of its advances to Transit's bank loans.

Transit and LWSI made new loan agreements with LIIBV, dated "as of September 1, 1986".  In the first of these agreements, signed by Haworth for Transit, LIIBV subordinated Laidlaw's and Transit's indebtedness to LIIBV to any amounts owed by Laidlaw to TDB.

LTL entered into postponement agreements in favor of RBC and BBC in November 1986. RBC and BBC relied on the agreements. The agreements provided that Canadian law applied.

On December 11, 1986, LTL's board of directors agreed to subordinate LII's debt to LTL to any loan from RBC to LII to prevent default under the RBC loan agreement. On the same day, LTL's board signed a loan agreement with LII and LWSI in which LTL lent LWSI $350 million to be due on October 14, 1989. The loan agreement required that, at LWSI's request, LWSI's indebtedness to LTL would be subordinated to the indebtedness of LWSI to RBC and BBC.

LTI and LTL signed a joint loan agreement with RBC in 1987, under which LTL guaranteed RBC's advances to LTI. LTL, LTI, and LII signed subordination agreements with several commercial banks, including RBC, BBC, and TDB in part because LTL and its subsidiaries were highly leveraged after the GSX acquisition. Petitioners and LIIBV gave each commercial bank priority over the intercompany advances from LTL and its subsidiaries (including LIIBV).

On February 13, 1987, Haworth told LIIBV that subordination of the LIIBV advances to petitioners would no longer be necessary. On March 16, 1987, LIIBV's board voided the subordination agreement in the first "as of September 1, 1986" agreement. A second "as of September 1, 1986" loan agreement, signed by Haworth and Cairns for Transit, included the amendments

suggested by Haworth other than the provision to subordinate loans.  It provided that LWSI or Transit would give LIIBV promissory notes and that the advances, which those notes represented, would be treated as if they had been made under the loan agreement.  The second "as of September 1, 1986" agreement substituted a demand feature for a fixed maturity date.  LIIBV did not require Transit, Tree, and LWSI to have a reserve or sinking fund to assure that they could repay the advances.  The second "as of September 1, 1986" agreement governed all prior advances by LIIBV to Transit or LWSI.

On July 7, 1987, LTI, Transit, LII, and LWSI signed new loan agreements with LIIBV.  These agreements governed all advances made by LIIBV to Transit and LWSI before July 7, 1987.  They included the same terms as the "as of September 1, 1986" agreements, except that (1) the July 7, 1987, agreements eliminated the demand feature from the previous loan agreements and established fixed terms with principal balances due September 1, 1989, unless the parties extended the due date by written agreement, and (2) the parties added some enforcement provisions, including an acceleration clause.  LIIBV did not require a reserve or sinking fund to assure that petitioners would repay the advances.

b.    Funds to Buy Tree and Advances to Tree

On May 25, 1987, LTL asked LIIBV to make a $20 million loan to LAC on May 28, 1987.  As stated at par. I-C-1, above, LTL used LAC to buy Monroe, which became Tree.  On May 27, 1987, LAC and LTI signed loan agreements with LIIBV, which had the same terms as LIIBV's July 7, 1987, agreements with LWSI and Transit.  LTI guaranteed repayment of the LIIBV advances to Tree.

c.    LIIBV's September 12, 1988, Board Meeting

On September 12, 1988, the members of LIIBV's board of directors discussed repayment by Transit, LWSI, and Tree of the advances from LIIBV.  At that time, the advances were due to be repaid on September 1, 1989.  The board decided to extend the repayment date.  The minutes for that meeting stated that LIIBV's management did not intend to request repayment.

6.    Repayment of Principal

Petitioners did not repay any principal to LIIBV from the date of the initial advance in December 1985 to October 1989. Petitioners repeatedly extended the due date for most of the principal amounts that petitioners owed to LIIBV.

Up until the time of trial, petitioners and their subsidiaries had not reduced the total unpaid balances that they owed to LIIBV below the $975,153,806 which was outstanding as of August 31, 1988.

7.  Payment of Interest

    a.  Background

During the years in issue, on the same day that LIIBV received payments from petitioners which petitioners and LIIBV denominated as interest, LIIBV generally transferred that amount of money to one or more petitioners in what petitioners called interest reinvestment loans.  LIIBV, Transit, LWSI, and Tree did this through a series of prearranged steps.  LTL and LIIBV decided how much interest each petitioner would owe before each interest payment was due.  LIIBV decided how much of the interest payment to use to pay its costs of operations and to pay dividends to LIL.  LTL decided which petitioner would ask for an interest reinvestment loan from LIIBV.

On the day that petitioners made a payment denominated as interest to LIIBV, LIIBV typically transferred to petitioners an amount equal or close to the amount of the payment.  Petitioners recorded these transactions in their books and records as interest payments.  Transit or LWSI made a payment denominated as interest to LIIBV each time they received an interest reinvestment loan from LIIBV.  Many of the transactions described in par. I-G-3, above, included interest reinvestment loans. LIIBV transferred to Transit, LWSI, and Tree interest reinvestment loans totaling more than 90 percent of what petitioners contend are interest payments to LIIBV for the years in issue.

Transit made no quarterly interest payments to LIIBV from May 1986 to November 1987. LWSI made no quarterly interest payments to LIIBV from February to August 1988. Instead, LIIBV increased Transit's and LWSI's account balances to include the interest payments due during that time.

During their 1989 taxable years, Transit, LWSI, and Tree increased their account balances to include interest on the interest reinvestment loans from LIIBV.

b. <u>Summary of Interest Payments and Interest Reinvestment Loans in the Years in Issue</u>

The following table shows interest reinvestment loans and what petitioners contend are interest payments in the years in issue:

| Date | Interest Reinvestment Loan From LIIBV | Claimed Interest Payment From Transit to LIIBV | Claimed Interest Payment From LWSI to LIIBV | Claimed Interest Payment From Tree to LIIBV | Total Claimed Interest Payments to LIIBV |
|---|---|---|---|---|---|
| 5/29/86 | $988,797*+ | $809,057 | $179,740 | - | $988,797 |
| 8/28/86 | 2,204,674* | 1,630,716 | 573,958 | - | 2,204,674 |
| 11/25/86 | 5,870,270* | 3,097,820 | 2,772,450 | - | 5,870,270 |
| 2/25/87 | 11,535,627* | 4,003,389 | 7,532,238 | - | 11,535,627 |
| 5/28/87 | 12,468,151* | 4,479,972 | 7,988,179 | - | 12,468,151 |
| 8/31/87 | 15,280,674* | 5,071,716 | 10,297,291 | $546,667 | 15,915,674 |
| 11/30/87 | 16,700,000* | 5,705,723 | 10,597,883 | 549,028 | 16,852,634 |
| 2/29/88 | 12,448,000** | 6,346,874 | 11,991,976 | 539,583 | 18,878,433 |
| 5/31/88 | 21,045,000** | 7,534,621 | 15,015,471 | 542,499 | 23,092,591 |
| 8/31/88 | 22,000,000** | 8,580,485 | 16,546,460 | 581,666 | 25,708,611 |
| Total | 120,541,193 | 47,260,373 | 83,495,646 | 2,759,443 | 133,515,462 |

* Advances to Transit; ** Advances to LWSI; + Included in $9,588,797 transfer on May 28 to 30, 1987.

An example of how petitioners used an interest reinvestment loan is the transaction on May 28 to 30, 1986, in which LIIBV transferred $988,797 to U.S. subsidiaries and U.S. subsidiaries claimed interest payments totaling $988,797.

### May 28 to May 30, 1986, Transfers

| U.S. Subsidiaries to LIIBV | | LIIBV to U.S. Subsidiaries | |
|---|---|---|---|
| LWSI | $179,740 | Transit | $8,600,000 |
| Transit | 809,057 | Transit reinvest | 988,797 |
| Total | 988,797 | Total | 9,588,797 |

### Steps for the May 28 to May 30, 1986, Transfers

1. LTL received $8.6 million from TDB on May 28.
2. LTL transferred $8.6 million to LIL on May 28.
3. LWSI transferred $179,740 to LIIBV on May 29.
4. Transit transferred $809,057 to LIIBV on May 29.
5. LIIBV transferred $9,588,797 to Transit on May 29. This caused an $8,596,000 overdraft in LIIBV's ABN Bank NY account.
6. LIIBV was credited with $8.6 million from LIL on May 30.

### 8. LTI's Commercial Loans

During its taxable years ending from August 31, 1989, to August 31, 1995, LTI frequently borrowed funds from commercial lenders to help make petitioners' quarterly interest payments and semiannual principal payments to LIIBV.

## H. Petitioners' Financial Condition

### 1. Capitalization of Petitioners in the Years in Issue

The transportation and waste services industries are capital-intensive. Petitioners constantly needed to buy trucks and buses and improve landfill sites. Petitioners could not eliminate or significantly reduce their capital spending for a

long period of time without hurting their business or possibly going out of business.

Petitioners were thinly capitalized and heavily leveraged during the years in issue largely because they borrowed large amounts from LIIBV before and during the years in issue.

2.   Petitioners' Cash-Flow During the Years in Issue

Petitioners' free cash-flow (earnings before interest, taxes, depreciation, and amortization (EBITDA) - capital expenditures (CAPEX)) for the years in issue[17] was negative as follows:

|     | 1986 | 1987 | 1988 |
| --- | --- | --- | --- |
| LTI | ($63,490,919) | ($351,973,233) | ($109,555,409) |
| LII | ($3,177,391) | ($294,312,141) | ($67,858,322) |

On August 31, 1988, petitioners did not have enough free cash-flow to pay (a) principal and interest due on the LIIBV advances unless petitioners stopped buying other companies and reduced other capital expenses by 20 percent, and (b) principal due over 7 years even if they stopped making all capital expenditures.

Petitioners and their companies did not have enough cash-flow during the years in issue to repay LIIBV's advances to them that are at issue here.  LII had negative free cash-flows during the years in issue largely because it and its subsidiaries were expanding.  Petitioners could not repay in installments or pay

_____

[17] LII's free cash-flow was a positive $3,888,281 for its 1985 fiscal year.

the balloon payment due in 1989 as required by the agreements between themselves and LIIBV.

    3.   <u>Petitioners' Tangible Net Worth and Financial Ratios for the Years in Issue</u>

LTI or LII guaranteed repayment of advances from LIIBV and commercial banks to Transit, Tree, and LWSI.  Financial statements for those companies for the years in issue (unaudited for LII for the year ending August 1988) show the following:

<u>LII</u>

| | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| Tangible Net Worth (000 omitted) | 57,022 | 84,341 | 42,659 | (22,630) |
| Quick Ratio[1] | .93 | 1.12 | 1.30 | 1.17 |
| Current Ratio[1] | 1.33 | 1.62 | 1.62 | 1.32 |
| Debt/Equity Ratio | .59 | .67 | 3.54 | 8.43 |
| Liabilities/Equity | .87 | .89 | 4.05 | 9.42 |
| Liab./Tang. N.W. | 1.38 | 1.31 | 13.35 | N/A |

<u>LTI</u>

| | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| Tangible Net Worth (000 omitted) | 18,865 | 28,400 | (33,204) | (58,027) |
| Quick Ratio | .87 | .76 | .83 | 1.02 |
| Current Ratio | 1.16 | 1.36 | 1.12 | 1.58 |
| Debt/Equity Ratio | 1.61 | 2.26 | 5.78 | 5.63 |
| Liabilities/Equity | 2.76 | 3.26 | 7.29 | 6.44 |
| Liab./Tang. N.W. | 9.93 | 12.02 | N/A | N/A |

    [1] "Current ratio" is current assets (cash and equivalents, receivables, and inventories) divided by current liabilities.  "Quick ratio" is cash and equivalents and receivables, or current assets less inventories, divided by current liabilities.  See Carmichael, et al., Accountant's Handbook, sec. 10.25, at 10.22 (7th ed. 1991).

Petitioners' competitors in the waste services industry during 1987 and 1988 generally had debt to equity ratios below 2 to 1.

LTI's long-term debt, equity, and debt to equity ratios for years ending from August 1989 to August 1995 were as follows (in thousands):

| Year | Long-Term Debt | Equity | Debt to Equity Ratio |
|------|------|------|------|
| 1989 | $1,788,165 | $385,956 | 4.63 |
| 1990 | 2,008,141 | 303,739 | 6.61 |
| 1991 | 1,989,926 | 475,642 | 4.18 |
| 1992 | 1,770,805 | 455,221 | 3.89 |
| 1993 | 1,741,133 | 317,935 | 5.48 |
| 1994 | 1,620,623 | 452,046 | 3.59 |
| 1995 | 2,249,500 | 412,500 | 5.45 |

Financial ratios for Transit and Tree for the years in issue were as follows:

Transit

| | 1985 | 1986 | 1987 | 1988 |
|------|------|------|------|------|
| Tangible Net Worth (000 omitted) | (7,020) | (18,734) | (21,529) | (56,284) |
| Quick Ratio | .13 | .40 | .77 | .81 |
| Current Ratio | .22 | .57 | 1.13 | 1.11 |
| Debt/Equity Ratio | 9.94 | 10.52 | 9.43 | 15.44 |
| Liabilities/Equity | 11.17 | 11.71 | 10.66 | 16.87 |
| Liab./Tang. N.W. | N/A | N/A | N/A | N/A |

Tree

| | 1985 | 1986 | 1987 | 1988 |
|------|------|------|------|------|
| Tangible Net Worth (000 omitted) | – | 4,354 | (11,666) | (5,711) |
| Quick Ratio | – | 1.40 | 1.16 | 1.47 |
| Current Ratio | – | 1.53 | 1.23 | 1.61 |
| Debt/Equity Ratio | – | .87 | 95.86 | 3.09 |
| Liabilities/Equity | – | 1.54 | 109.84 | 3.43 |
| Liab./Tang. N.W. | – | 1.55 | N/A | N/A |

Petitioners' ratios for earnings before taxes (EBIT) to interest and EBITDA minus CAPEX to interest for the years in issue (unaudited for LII for the year ending August 1988) are as follows:

### LII

|  | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| EBIT/Interest | 8.93 | 7.89 | 1.9 | 1.65 |
| EBITDA minus CAPEX/Interest | .94 | (.77) | (7.81) | (1.16) |

### LTI

|  | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| EBIT/Interest | 7.14 | 3.38 | 1.82 | 1.50 |
| EBITDA minus CAPEX/Interest | (4.04) | (3.92) | (6.15) | (1.19) |

The ratios of EBIT to interest for Transit and Tree for the years in issue were as follows:

|  | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| Transit | 2.66 | 1.98 | 1.59 | 1.06 |
| Tree | – | 8.30 | 1.85 | 1.00 |

## I. Bank Loans

### 1. Debt to Equity Ratios Required by Banks

Petitioners' ability to borrow from commercial lenders was limited by leverage ratios and other covenants included in the loan agreements.[18] The maximum that petitioners could borrow under all of their commercial loan agreements without special approval by the bank was the amount of debt that would not increase their debt to equity ratio to more than 2 to 1. LTL, LTI, LII, and LWSI had commercial loan agreements which required them as the borrower or the guarantor to have debt to equity ratios of 2.5 to 1 or less in the taxable years in issue. The GSX acquisition caused LII to be highly leveraged, which

---

[18] The banks could waive the debt to equity ratio limit.

prevented LII from obtaining additional financing from commercial lenders.

### 2. Transit

Transit had no loans from unrelated lenders during the years in issue.

### 3. LWSI

During the years in issue, LWSI had a $20-$25 million revolving loan agreement with RBC (Portland, Oregon branch).

On November 14, 1986, LWSI and LWSL agreed to a joint revolving loan from RBC, which combined their existing credit agreements and increased the credit line to $140 million and later to $240 million.

LWSI's loan agreements with RBC included conventional covenants, representations, warranties, and security provisions. LII guaranteed the RBC loans to LWSI. RBC required LII to have a total debt to equity ratio of no greater than 2 to 1 and a working capital ratio (current assets over current liabilities) of no less than 1 to 1.

### 4. Tree

Before LTI acquired Tree's stock, Tree (then Monroe) had a term credit agreement with Chase for $3 to $5.5 million. The terms of Tree's loan agreement with Chase were considerably less favorable than those with LIIBV. Tree's loan agreement with Chase included conventional covenants, representations, warranties, and security provisions. Chase secured the loan to

Tree with Tree's assets.  Tree agreed to maintain minimum leverage ratios, current ratios, and interest coverage ratios[19] and to meet minimum cash-flow requirements.

J.   Comparison of Terms Governing Advances from LIIBV and Bank Loans

   1.   Similarities Between Bank Loans and LIIBV Advances

The bank loans and LIIBV advances for the years in issue were in writing.  All were for general corporate purposes or acquisition of other businesses.  All had some representations and warranties to the bank or LIIBV about financial conditions of the recipient.  All required corporate existence and authority, punctual payments, some type of periodic reporting, and notice of default.  All imposed limitations on further encumbering any security.  All treated nonpayment, incorrect or false representations, noncompliance with material terms and conditions, insolvency or bankruptcy, and other similar events as a default.  Most had cross-default clauses and acceleration clauses.  Most were guaranteed by a parent.  All allowed prepayment without penalty.

   2.   Differences Between Bank Loans and LIIBV Advances

Bank loans always had borrowing limits.  The LIIBV advances were generally not limited.  Banks lent less than LIIBV advanced.

---

[19] Interest coverage ratios relate the financial charges of a firm to its ability to service them.  An interest coverage ratio is earnings before interest and taxes net of non-cash expenses such as depreciation and amortization (EBITDA) divided by interest expense.  This ratio is one measure of a company's ability to pay interest.

Half of the LIIBV advances were more than $100 million, but most of the bank loans were substantially less than $100 million. Bank loans were generally for a 5-year period, and no bank loan had a demand feature. LIIBV advances were generally not limited to a fixed period and generally had demand features. LIIBV generally did not require petitioners to make quarterly or semiannual payments of principal, but did allow balloon payments. Banks required quarterly or semiannual payments of principal and did not allow balloon payments. Banks required minimum debt to equity and current assets to current liabilities ratios. LIIBV generally did not.

The guaranties differed in that the banks required the guarantors to post collateral and to meet financial requirements. LIIBV did not.

Only bank loans had negative covenants that limited the use of the borrowed funds, or placed limitations on a change of the borrower's business or on asset dispositions. LIIBV advances did not. Bank loans generally had more covenants and warranties relating to the borrower's legal status and activities (e.g., compliance with ERISA and securities laws) than LIIBV advances. Banks treated material adverse changes in the borrower's operations or financial condition, certain judgments, and liquidation, dissolution, or winding up of the borrower's business as events of default. LIIBV did not.

K.    Audit of LTL by Canadian Tax Authorities

Canadian income tax authorities audited LTL for 1987 and 1988. LTL wrote that its U.S. subsidiaries used funds that it advanced to them to provide capital and that those funds became part of the permanent capital of the company. LTL said that the advances provided about 35 percent of the total capital of Laidlaw in 1987 and 1988. LTL said that if it were to incur a loss on a loan to a subsidiary it would not be allowed to deduct the loss as a bad debt. LTL said:

> 3.    Laidlaw Inc. acts as a conduit in providing funds for its operating subsidiaries. The funds are used by the subsidiaries as working capital and for capital acquisitions. Without these funds, the subsidiaries would be seriously undercapitalized. The loans are in the nature of capital contributions to the subsidiaries.

## II.   OPINION

A.    Contentions of the Parties

The sole issue for decision is whether payments totaling $133,515,459 from petitioners' subsidiaries to LIIBV during the years in issue are deductible as interest under sections 162 and 163(a).

Respondent determined and contends that petitioners may not deduct the payments in dispute as interest because the LIIBV advances to Transit, Tree, and LWSI were capital contributions and not loans. Petitioners contend that the amounts in dispute are deductible as interest under sections 162 and 163(a) because the LIIBV advances were debt and because the amounts at issue

were interest in substance and form. Respondent's determination is presumed to be correct, and petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

B.    Loans vs. Capital Contributions

The U.S. Court of Appeals for the Fifth Circuit, the circuit to which these cases are appealable, has identified 13 nonexclusive factors to be considered in deciding whether advances are debt or equity. Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972). Those factors are: (1) the name given to the certificate evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments, i.e., whether the recipient of the funds can repay the advance with reasonably anticipated cash-flow or liquid assets; (4) whether the provider of the funds has the right to enforce payment; (5) whether the provider of the advance gains an increased right to participate in management; (6) the status of the contribution in relation to regular creditors; (7) the intent of the parties; (8) whether the recipient of the advance is adequately capitalized; (9) whether there is an identity of interest between the creditor and the shareholder; (10) source of interest payments, i.e., whether the recipient of the funds pays interest from earnings; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the recipient used the advance to buy capital assets;

and (13) whether the recipient repaid the funds on the due date (Mixon factors).  Id.; see also Texas Farm Bureau v. United States, 725 F.2d 307, 311 (5th Cir. 1984); Slappey Drive Indus. Park v. United States, 561 F.2d 572, 582 (5th Cir. 1977); Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 718-719 (5th Cir. 1972), affg. T.C. Memo. 1970-182; Tyler v. Tomlinson, 414 F.2d 844, 848 (5th Cir. 1969); Berkowitz v. United States, 411 F.2d 818 (5th Cir. 1969); Montclair, Inc. v. Commissioner, 318 F.2d 38, 40 (5th Cir. 1963), affg. T.C. Memo. 1962-10; American Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991).

We decide how much weight to give to each of these factors based on the facts and circumstances of each case.  Estate of Mixon v. United States, supra; see John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946).  Our task is not to count factors, but to evaluate them.  Slappey Drive Indus. Park v. United States, supra at 581.

C.   Substance vs. Form

A payment for which a taxpayer seeks a deduction must have economic substance.  Gregory v. Helvering, 293 U.S. 465 (1935); United States v. Wexler, 31 F.3d 117, 124 (3d Cir. 1994); Krumhorn v. Commissioner, 103 T.C. 29, 48 (1994).

The substance of a transaction and not the form controls, especially where the nominal debtor and the nominal creditor are jointly controlled.  Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1124 (4th Cir. 1969), affg. on this issue, vacating

and remanding T.C. Memo. 1967-187.  If a transaction is controlled by related entities, the form and labels used may not signify much because the parties can mold the transaction to their will.  See Anchor Natl. Life Ins. Co. v. Commissioner, 93 T.C. 382, 407 (1989).

Petitioners contend that the transactions at issue were negotiated and executed at arm's length and that LTL and DeGroote and his management team did not control LIIBV and petitioners. We disagree that the transactions were at arm's length.  DeGroote and his management team controlled all of the Laidlaw entities, including petitioners and LIIBV.

Petitioners contend that LIIBV lent money to petitioners that it had received as interest income under separately negotiated arm's-length transactions.  We disagree.  The LTL management group controlled petitioners and LIIBV.  The existence of a common chair, directors, officers, and core management team, and the fact that there were related entities with interlocking directorates, all indicate that the transactions at issue were not negotiated at arm's length.

DeGroote and his management team developed and implemented an elaborate plan to transfer funds between the Laidlaw entities. For example, by letter dated October 16, 1986, Haworth directed LIIBV to change the terms governing the advances to U.S. subsidiaries and make those changes effective "as of" September 1, 1986.  LIIBV did exactly what Haworth directed.  LIIBV could

have sued, but did not, to enforce the agreements. LIIBV repeatedly extended the due date for payments. LIIBV returned most of the money to petitioners on the same day that it received payments from petitioners. These facts show that LIIBV did what LTL and DeGroote and his management team wanted, and did not deal at arm's length.

Petitioners contend that the fact that the public owned 21 percent of the stock of LII shows that LII dealt at arm's length with LIIBV. We disagree. The public owned 21 percent of LII stock before December 16, 1987, but did not own any LII stock thereafter. DeGroote and his core management team controlled petitioners throughout the years in issue.

Petitioners contend that DeGroote sought independent directors and that Ferrill was independent. Petitioners point out that Ferrill convinced DeGroote to increase the repurchase price of publicly-owned LII stock and that Ferrill was on a special committee to review financing proposals to pay for the GSX acquisition, which petitioners contend shows that Ferrill is independent. We disagree that these facts establish that the Laidlaw entities dealt at arm's length. DeGroote loyalists controlled the Laidlaw entities, including boards of which Ferrill was a member.

Petitioners point out that LIIBV had foreign directors. This fact does not convince us that petitioners dealt with LIIBV at arm's length. Haworth's October 16, 1986, letter to LIIBV,

the October 20, 1986, minutes of LIIBV's board of directors, and the entire record show that LIIBV followed DeGroote's and his core management team's instructions.

Petitioners point out that the LIIBV board revised some of the documents that Haworth and Cairns had authored.  For example, Haworth changed the grid system promissory note required by his October 16, 1986, letter to LIIBV.  Despite this, the foreign directors were clearly subordinate to DeGroote and his management team.

We conclude that petitioners, LIIBV, and LTL acted in concert with DeGroote and his core management team and not at arm's length.  The form and the labels used for the transaction may signify little when the parties to the transaction are related.  Calumet Indus. Inc. v. Commissioner, 95 T.C. 257, 286 (1990); Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575, 578 (1968).

The fact that the dealings between LTI, LII, and their subsidiaries, and LIIBV were not at arm's length requires that we give less weight to the Mixon factors relating to the form of the transaction than to substance.  See Gregory v. Helvering, 293 U.S. 465 (1935); Texas Farm Bureau v. United States, 725 F.2d at 312; Estate of Mixon v. United States, supra at 407; Tyler v. Tomlinson, supra at 850; Road Materials, Inc. v. Commissioner, supra at 1124.

D.    The Mixon Factors

   1.    The Name Given to the Certificates Evidencing the
         Advances

The name given to the certificates evidencing the advances

suggests whether advances are debt or equity.  Estate of Mixon v.

United States, supra at 402-403.  The labels on the documents

evidencing the advances at issue say that they are debt.

However, an attempt to characterize a transaction by its labels

may not be well taken in light of the facts and circumstances of

the case.  Id. at 404.  Labels cannot change equity to debt.

Gregory v. Helvering, supra; Estate of Mixon v. United States,

supra.

   This factor favors treating the LIIBV advances to

petitioners as debt but, as stated at par. II-C, above, we give

less weight here to the form than to the substance of the

transaction.

   2.    The Presence or Absence of a Fixed Maturity Date

The presence of a fixed maturity date can indicate that an

advance was debt.  Estate of Mixon v. United States, supra at

404-405.  However, the right to enforce maturity dates may be

meaningless if the parties do not expect the recipient to repay.

Foresun, Inc. v. Commissioner, 41 T.C. 706, 717 (1964), affd. in

part, modified in part and remanded 348 F.2d 1006, 1009 (6th Cir.

1965); see Slappey Drive Indus. Park v. United States, 561 F.2d

at 583 & n.18; Harlan v. United States, 409 F.2d 904, 907 n.4

(5th Cir. 1969). Postponing maturity dates for prolonged periods suggests that the nominal lender does not intend to require repayment and that the transfers are equity. Slappey Drive Indus. Park v. United States, supra; Harlan v. United States, supra; Foresun, Inc. v. Commissioner, supra.

Most of the agreements had fixed maturity dates.[20] However, LIIBV's directors did not intend to request repayment. LIIBV continually extended and never enforced loan maturity dates.

The fixed maturity dates in the documents appear to be window dressing to make the form of the transaction look like debt. We give more weight to the substance of the transactions than to the fact that the documents provided for fixed maturity dates. Tyler v. Tomlinson, supra at 850. We are not bound by the language of an agreement if it is at odds with the substance of the transaction. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Tyler v. Tomlinson, supra at 849. The Laidlaw entities, including LIIBV and petitioners, adhered to the form of the contracts by postponing maturity dates, but did not adhere to the maturity dates in substance.

The initial loan agreements with LIIBV provided for a fixed maturity date of September 1, 1988. The "as of" September 1, 1986, agreements changed the fixed maturity date to payment on demand. Provision for payment on demand without a fixed maturity

---

[20] Some agreements were demand loans with no maturity dates.

date may indicate that an advance is equity.  Estate of Mixon v. United States, supra at 405; Dillin v. United States, 433 F.2d 1097, 1101-1102 (5th Cir. 1970).

Petitioners contend that this factor should not weigh against them merely because they refinanced the LIIBV loans. Petitioners contend that refinancings are a common banking practice.  Petitioners rely on Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. 451, 457 (1969).  We disagree.  In Green Bay Structural Steel, we decided that refinanced subordinated notes were bona fide indebtedness for which the taxpayer could deduct interest.  That is not the case here.  Also, there was no evidence that there was a circular flow of funds in Green Bay Structural Steel.  See par. II-D-10, below.

Petitioners contend that the payment on demand feature does not suggest that the advances were equity here because the LIIBV directors were independent from LTL, and they controlled whether a demand for payment would be made.  We disagree as discussed at par. II-C, above.      This factor supports treating the LIIBV advances to petitioners as equity.

3.  The Source of Payments, i.e., Whether the Recipient of Funds Can Repay the Advance With Reasonably Anticipated Cash-Flow or Liquid Assets

An advance is more likely to be equity if the recipient does not have liquid assets or reasonably anticipated cashflow from

which to repay.  Estate of Mixon v. United States, supra at 405;[21]
Segel v. Commissioner, 89 T.C. 816, 830-831 (1987).

Petitioners contend that they had enough cash and liquid
assets to pay interest or principal on the $975,153,806 that they
owed to LIIBV on August 31, 1988, and to continue operations.
Petitioners contend that they had EBITDA of $2.87 billion and
capital contributions of $585 million, less interest payments to
LIIBV and banks of $1.3 billion, for a total cash-flow of $2.9
billion to repay the $975,153,806.  We disagree.

Petitioners' liquid assets and cash-flow were insufficient
to pay the interest or the principal balance.  LTI's and LII's
cash-flow ((EBITDA - CAPEX) and (EBITDA - CAPEX)/Interest)) for
each of the 3 years in issue were negative (from negative
$3,177,391 to negative $351,973,233).  Petitioners could not
repay the advances with their liquid assets.  Transit from 1985
to 1988 and Tree in 1987 and 1988 had negative tangible net
worth.  By the last year in issue, LII's tangible net worth was
negative $22,630,000, and LTI's tangible net worth was negative
$58,027,000.

Petitioners allege that use of EBITDA minus CAPEX as a
measure of available cash-flow is incorrect because petitioners
could defer spending capital.  We disagree.  To repay

---

[21] This factor is somewhat anomalous because most loans are
repaid out of earnings.  Estate of Mixon v. United States, 464
F.2d 394, 405 n. 15 (5th Cir. 1972).

$975,153,806 of principal from July 1987 to May 1994 and to pay interest, petitioners would have had to stop buying companies and capital assets. It would be difficult or impossible for LTI or LII to survive if they significantly reduced or eliminated their capital spending.

Petitioners contend that they had many sources from which to repay LIIBV. Petitioners contend that they could have sold tangible and intangible (e.g., licenses, permits, and goodwill) assets, or refinanced the LIIBV loans with their operational cash-flow. This argument misconstrues this factor, which requires that we consider whether petitioners could repay the advances with reasonably anticipated cash-flow or liquid assets.

Petitioners sold their solid waste business in 1996 for $1.2 billion and bought a health transportation business. Petitioners contend that this sale shows that their intangible assets had substantial value during the years in issue. This argument is unconvincing. Even if petitioners' intangible assets had substantial value during the years in issue, we doubt that petitioners could have operated their business without those assets.

Petitioners contend that they could have extended the due dates for repaying the $975,153,806, and that they did not need to repay that amount in 7 years. Petitioners point out that Robert T. Jacobs (Jacobs), their banking expert, testified that it was not unusual during the 1980's to extend loans for 12-18

year terms for leveraged buyouts.  We are not convinced by that testimony.  First, petitioners' commercial loans during the years in issue were generally for 5 years.  Second, leveraged buyouts typically require the borrower to provide a security interest in its assets, and are subject to financial covenants which impose severe restrictions unlike the LIIBV advances.

This factor supports treating the LIIBV advances to petitioners as equity.

4.    Whether the Provider of the Funds Has the Right to Enforce Payment of Principal and Interest

A definite obligation to repay an advance suggests that the advance is a loan.  Estate of Mixon v. United States, supra; see Campbell v. Carter Found. Prod. Co., 322 F.2d 827, 832 (5th Cir. 1963).  The documents evidencing the LIIBV advances showed that LIIBV had a right to enforce payment of principal and interest.  Petitioners contend that these loan agreements are significant because they were legally binding.  We disagree because LIIBV and petitioners did not enforce any of the loan agreements.  The fact that the agreements may have been legally binding counts for little if, as here, the parties understood that they would never be enforced.  As discussed at par. II-D-3, above, the right to enforce payment may be meaningless if the parties do not expect the recipient to repay.

This factor supports treating the LIIBV advances to petitioners as equity.

5. Whether the Provider of the Advance Gains an Increased Right To Participate in Management

If, as a result of an advance of funds, the provider of the funds has an increased right to participate in the management of the recipient, then it is acting more like a shareholder than a creditor. Estate of Mixon v. United States, supra at 406. The documents evidencing the advances did not give LIIBV any right to participate in the management of the borrowers or the guarantors. However, this would have been unnecessary because LTL and its core management team already controlled LIIBV and petitioners.

This factor is neutral.

6. The Status of the Contribution in Relation to Regular Creditors

Whether an advance is equal or subordinate to the claims of regular corporate creditors affects whether the taxpayer was dealing as a shareholder or creditor. Estate of Mixon v. United States, supra.

Petitioners point out that Haworth testified that LIIBV did not subordinate or postpone petitioners' repayment to it. Petitioners contend that the LIIBV loans to Transit and Tree (guaranteed by LTI) were not subject to subordination or postponement agreements. Petitioners contend that, although LTL entered into postponement agreements in favor of RBC and BBC in November 1986, these agreements did not affect LIIBV's legal rights under its loans to LWSI. Petitioners contend that the postponement agreements were not subordination agreements under

Canadian law because the intent of the parties in entering into the agreements was not to subordinate LTL's rights to the rights of RBC, BBC, or any other third-party creditor; LIIBV was not a party to the postponement agreements; the parties did not intend the agreements to be subordination agreements; and the postponement agreements were not enforceable as unregistered securities.

Petitioners' arguments do not convince us to disregard the postponement agreements for purposes of applying this factor. The postponement agreements were effective immediately and provided that Canadian law applied. LTL signed on behalf of its subsidiaries and agreed to make transfers, deliver assignments and documents, and do all acts necessary to implement the agreements. Petitioners' commercial banks relied on the agreements. Petitioners point out that E. Alan Peters (Peters), petitioners' Canadian banking law expert, testified that the postponement agreements were not subordination agreements under Canadian law. However, Peters also testified that the postponement agreements were enforceable under Canadian law, and that they subordinated one creditor's right to payment to that of another creditor.

Petitioner contends that the postponement agreements had less effect than inchoate subordination agreements. Petitioners make too much of this point because the postponement agreements,

even if inchoate, increased LIIBV's risk.  See <u>United States v.</u>
<u>Snyder Bros. Co.</u>, 367 F.2d 980, 981, 984-985 (5th Cir. 1966).

Failure to demand timely repayment effectively subordinates
intercompany debt to the rights of other creditors who receive
payment in the interim.  <u>American Offshore, Inc. v. Commissioner</u>,
97 T.C. 579, 603 (1991); <u>Inductotherm Indus., Inc. v.</u>
<u>Commissioner</u>, T.C. Memo. 1984-281, affd. without published
opinion 770 F.2d 1071 (3d Cir. 1985).  LIIBV's postponement of
repayments by petitioners effectively subordinated what
petitioners contend is debt to LIIBV.

The question before us is whether the advance has a status
equal or inferior to the claims of a regular corporate creditor.
<u>Estate of Mixon v. United States</u>, <u>supra</u>.  We conclude that the
postponement agreements and the effective subordination as a
result of failing to demand repayment made the obligations to
repay LIIBV inferior to the claims of petitioners' regular
corporate creditors.  Thus, this factor supports treating the
LIIBV advances to petitioners as equity.

7.   <u>Intent of the Parties</u>

The intent of the parties is important in deciding whether
payments are debt or equity.  Petitioners contend that they
intended their payments to LIIBV to be interest.  Petitioners
rely primarily on the evidence showing the form they used for the
transactions at issue.  More weight is given to objective facts

than to stated intent.  In re Lane, 742 F.2d 1311 (11th Cir.
1984).  The Court of Appeals for the Fifth Circuit has said:

> Primary reliance upon subjective indications of intent
> is simply not an effective way of resolving * * * [the
> debt versus equity] problem.  In a land of hard
> economic facts, we cannot root important decisions in
> parties' pious declarations of intent. * * *

Texas Farm Bureau v. United States, 725 F.2d at 314.  Thus, to
reveal a taxpayer's intent, we must consider not only the
pronouncements of the parties, but also the circumstances
surrounding the transaction.  Tyler v. Tomlinson, 414 F.2d at
850.

Petitioners referred to the advances as loans, and surely
wanted the advances to be treated as loans; however, that is not
the same as intending the advances to be loans.  Despite
petitioners' worsening finances, LIIBV made large advances,
extended the terms for payment, and did not seek security in the
written agreements.  Petitioners did not intend in substance to
pay interest; they intended LIIBV to advance funds whenever
interest was due.  Petitioners intended LIIBV to continue to
advance funds with no expectation that petitioners would repay.
LTL represented to Canadian tax officials that the loans are "in
the nature of capital contributions".  This factor supports
treating the LIIBV advances to petitioners as equity.

8.   Whether the Recipient of the Advance Is Adequately Capitalized

a.   Capitalization of Petitioners

Inadequate capitalization strongly suggests that an advance is equity if:  (a) The debt to equity ratio was initially high, (b) the parties realized that it would likely go higher, and (c) the recipient of the funds used a substantial part of the funds to buy capital assets and to meet expenses needed to begin operations.  Estate of Mixon v. United States, supra at 408; United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967). Courts generally consider a borrower's debt to equity ratio and other financial data in deciding if it is thinly capitalized. See, e.g., Tyler v. Tomlinson, supra at 848-849.

The GSX purchase made petitioners' debt to equity ratio high during the first year in issue which ended August 31, 1986. Petitioners contend that they were not thinly capitalized. They contend that both their and respondent's experts testified that they were not thinly capitalized and that their financial condition was as good as their competitors.  We disagree. Petitioners' debt to equity ratio worsened after buying GSX because they continued to receive advances from LIIBV. Petitioners used most of the advances from LIIBV to pay capital expenses such as to acquire more businesses.

Theresa Poppei (Poppei), petitioners' expert, and David N. Fuller (Fuller), respondent's expert, testified about

petitioners' value during the years in issue. Petitioners' other experts used Poppei's values and conclusions to evaluate petitioners' financial condition, including capitalization. Poppei testified that LII's financial performance was better than WMI's and BFI's. However, her peer group financial performance charts show that WMI and BFI performed better financially than petitioners did. These charts are corroborated by petitioners' credit analyst, Carol Verschell, who said in her expert report that the debt to equity ratios for BFI and WMI were superior to petitioners'.

      b.    Use of Fair Market Values To Compute Debt to Equity Ratios

Petitioners contend that we should use fair market values and not book values to compute debt to equity ratios. Petitioners point out that Jacobs testified that there is an "increasing focus on market value of equity versus book equity in analyzing capital structure" especially in the leveraged buyout market, and that he concluded that petitioners were adequately capitalized. Jacobs also testified that investment bankers provided funds for highly-leveraged transactions based on cash-flow.

We disagree. As discussed at pars. I-H-2 and II-D-3, above, petitioners' cash-flow was poor. The leverage ratios and coverage ratios in petitioners' loan agreements were based on book values. None of the loan documents stated that the leverage

or coverage ratios were based on fair market values. Banks which made commercial loans to petitioners generally determined financial ratio requirements by referring to the book values of the Laidlaw borrowers and guarantors.

Petitioners contend that it is well established that a borrower's debt to equity ratio is based on the fair market value of its assets, citing Dillin v. United States, 433 F.2d 1097, 1102 (5th Cir. 1970). We disagree with petitioners' reading of Dillin. In that case, the fund recipient's debt to equity ratio was 800 to 1 based on book value and 2.5 to 1 based on fair market value. The Court of Appeals for the Fifth Circuit affirmed the district court's decision that the advance was equity. Even if we considered fair market value debt to equity ratios, petitioners fare no better because their debt to equity ratios were worse than those of their competitors using either book or fair market values. See also Slappey Drive Indus. Park v, United States, 561 F.2d at 579, 584-585 n.22 (discussing but not deciding whether fair market values are relevant in deciding whether capitalization is adequate).

### c. Whether To Consider Only Debt and Equity Related to Capital Assets To Start Operations

Petitioners contend that, in applying this factor, Estate of Mixon v. United States, supra at 408, requires that we consider only debt and equity related to capital assets needed to start operations. We disagree. Estate of Mixon v. United States,

supra, did not involve the start of an operation; it involved advances to a bank that had suffered a large embezzlement loss. Courts consider capital costs other than costs to start a business in deciding whether a corporation is inadequately capitalized. E.g., Plantation Patterns, Inc. v. Commissioner, 462 F.2d at 722; Tyler v. Tomlinson, 414 F.2d at 848-850; C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. 649, 657 (1968); Foresun, Inc. v. Commissioner, 41 T.C. at 717.

      d.   Debt to Equity Ratios of LTI and LII as Guarantors

Petitioners contend that we should take into account LTI's and LII's debt to equity ratios because they were guarantors. Even if we agreed, it would not affect our analysis. LTI's debt to equity ratios were 2.26 for 1986, 5.78 for 1987, and 5.63 for 1988. LTI's debt to equity ratio averaged 4.56 and exceeded 2 to 1 for each of the years in issue. LII's debt to equity ratios were .67 for 1986, 3.54 for 1987, and 8.43 for 1988. LII's debt to equity ratio averaged 4.21 and exceeded 2 to 1 for the last 2 of the 3 years in issue. LTI's and LII's debt to equity ratios generally worsened each year in issue.

Petitioners point out that Michael J. Kennelly (Kennelly), petitioners' accounting expert, stated that LTI's and LII's debt to equity ratios were acceptable. However, he used incorrect assumptions in his debt to equity ratio calculations. Kennelly relied on Poppei's conclusions of value. We are not persuaded by Poppei's conclusions. Poppei unrealistically assumed that

petitioners would have zero capital expenditures for landfills and buildings during the 10 years that she considered. We believe that assumption is unrealistic because waste companies must incur a substantial amount of capital expenditures to develop landfills and acquire other assets in the normal course of operations. Poppei's market value approach erroneously assumed LII's invested capital would increase by 17.9 percent in the year ending August 31, 1988, while the invested capital of WMI decreased 2 percent and BFI decreased 4 percent.

Fuller's calculations were also incorrect because he should have applied, but did not apply, a minority discount for LII's minority interest (which Poppei properly did). He did not compute financial ratios for LII, and his ratios for LTI did not include adjustments for the LII minority interest.

### e. Conclusion

We conclude that petitioners were thinly capitalized. This factor supports treating the LIIBV advances to petitioners as equity.

### 9. Identity of Interest Between Creditor and Shareholder

If advances by shareholders are proportionate to their stock ownership, the advances are more likely to be equity. Estate of Mixon v. United States, supra at 409; Tomlinson v. 1661 Corp., 377 F.2d 291 (5th Cir. 1967); Leach Corp. v. Commissioner; 30 T.C. 563, 579 (1958).

Petitioners contend that this factor supports treating the LIIBV advances to them as debt because LIIBV did not own any stock of petitioners. We disagree. The fact that LIIBV did not own stock of petitioners is insignificant because LTL, through DeGroote and his core management team, controlled petitioners and LIIBV. See Plantation Patterns, Inc. v. Commissioner, supra; Foresun, Inc. v. Commissioner, supra.

Petitioners contend that the LIIBV advances were freely transferable. They rely on Tomlinson v. 1661 Corp., supra at 297, in which the Court of Appeals for the Fifth Circuit said that if a debenture is freely transferable, the proportional participation and control factor does not apply. Even if petitioners were correct on this point, the result would be that we would treat this factor as neutral.

Petitioners contend that this factor should be given little weight with respect to LWSI before December 1987 because about half of LII's shares were then publicly held. We disagree that the fact that some of LII's stock was publicly held helps petitioners. First, LII's directors had reason to approve the LIIBV advances because LII could not get financing from commercial lenders with terms more favorable to LWSI and LII than they could get from LIIBV. Second, LII's brief period with minority shareholders and independent directors did not mean it dealt with LIIBV at arm's length.

This factor is neutral.[22]

10. <u>Source of Interest Payments, i.e., Whether the Recipient of the Funds Pays Interest From Earnings</u>

Payment of interest by the recipient of an advance suggests that a transfer is debt. <u>Estate of Mixon v. United States</u>, <u>supra</u>.

Petitioners contend that they paid all of the interest due to LIIBV in the amounts and on the dates required by the loan agreements and promissory notes, and that they paid the interest at issue. We disagree. LIIBV usually paid one of the three operating companies (Transit, Tree, and LWSI) on the same day and often in the same amount of the payments that LIIBV had received that day. Petitioners' payments to LIIBV did not change petitioners' financial position because LIIBV immediately returned the vast majority of funds to petitioners as interest reinvestment loans. In substance, petitioners paid interest to LIIBV at most sporadically because funds flowed in a carefully orchestrated circle.[23]

---

[22] We could also conclude that this factor supports treating the LIIBV advances to petitioners as equity because LIIBV and petitioners are indirectly held by LTL, and thus 100 percent of the advances came from petitioners' 100-percent owners. This suggests that LIIBV and petitioners had an identity of interest. <u>Harmont Plaza, Inc. v. Commissioner</u>, 64 T.C. 632, 645 (1975), affd. 549 F.2d 414 (6th Cir. 1977); see <u>Rickey v. United States</u>, 592 F.2d 1251, 1257-1258 (5th Cir. 1979) (discussing attribution rules of sec. 318).

[23] Respondent relied on these facts in arguing that sec. 267(a)(3) applies. Petitioners did not dispute respondent's contention that there was a circular flow of funds.

Transit's and LWSI's payments to LIIBV which they contend are interest are similar to the payments in Merryman v. Commissioner, 873 F.2d 879, 882 (5th Cir. 1989), affg. T.C. Memo. 1988-72; see also Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23; United States v. Clardy, 612 F.2d 1139, 1151-1152 (9th Cir. 1980); Zirker v. Commissioner, 87 T.C. 970, 976 (1986); Drobny v. Commissioner, 86 T.C. 1326, 1343 (1986). affd. 113 F.3d 670 (7th Cir. 1997); Karme v. Commissioner, 73 T.C. 1163, 1186-1187 (1980), affd. 673 F.2d 1062 (9th Cir. 1982), in that the payments did not change petitioners' economic status.

Petitioners contend that these cases are indistinguishable from Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441. We disagree. The taxpayer in that case paid interest and reduced its overall indebtedness during the years in issue, and its financial condition was improving. Here, petitioners postponed interest payments, used debt to finance interest payments, and continued to increase their indebtedness. In addition, the funds recipient in Nestle, unlike petitioners, was not highly leveraged, had reasonably anticipated significant cash-flows adequate to pay interest and principal, and had liquid assets which it would use to reduce its indebtedness.

Petitioners contend that their interest reinvestment loans were merely a device to help LIIBV comply with Dutch tax rulings. We disagree. Whether or not the interest reinvestment loans had

that effect, they meant that, in substance, petitioners paid no interest to LIIBV.

This factor supports treating the LIIBV advances to petitioners as equity.

11. <u>Ability of the Corporation To Obtain Loans From Outside Lending Institutions</u>

If a corporation can borrow money from outside sources when it receives a transfer of funds, the transfer is more likely to be debt. <u>Estate of Mixon v. United States</u>, <u>supra</u> at 410; <u>Tomlinson v. 1661 Corp.</u>, <u>supra</u>.

Petitioners contend that they could have borrowed $975,153,806 from outside sources during the years in issue on commercially reasonable terms. To support their position, petitioners cite the testimony of Jacobs, petitioners' expert Hollis W. Rademacher (Rademacher), and three letters from investment bankers.

Rademacher testified that a bank would not have required the loans to be secured, but that a negative pledge or prohibition against other indebtedness for borrowed money would have sufficed. In contrast, respondent's expert, Filmore G. Enger, Jr. (Enger), testified that security would be very important for loans of this magnitude. We think Enger's view was more realistic. Generally speaking, creditors avoid subjecting funds to the risk of the borrower's business as much as possible and seek a reliable return, while shareholders take that risk and hope for a return from the business' success. <u>Slappey Drive</u>

Indus. Park v. United States, 561 F.2d at 581; Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695, 698 (4th Cir. 1963), affg. T.C. Memo. 1962-194. Rademacher's position would subject the creditor to undue risk.

Jacobs testified that it would have been possible for petitioners to get large loans. However, he said that loans this size would require security because petitioners were highly leveraged. He cited examples of large bank loans made to highly-leveraged companies during the years in issue. However, those examples are not compelling here because those loans were to companies that were much larger than petitioners, and they included various security arrangements including guaranties, as here. Jacobs concluded that it was not clear that LTI and LII could have borrowed as much from commercial banks as they received from LIIBV. He said they might have been able to borrow large amounts if they first had a public offering of subordinated debt.

Petitioners contend that Enger testified that petitioners could have obtained bank financing in the amounts that LIIBV advanced to petitioners. We disagree. Enger testified that petitioners could not obtain bank financing from commercial lenders on terms comparable to the LIIBV agreements, and could obtain financing only by using equity and subordinated and senior indebtedness.

Petitioners contend that the three investment bankers' proposals show that they could have reasonably obtained

$975,153,806. We disagree. The investment bankers did not propose to raise $975,153,806. Dean Witter proposed to use subordinated notes to raise $325 million. Bear Stearns proposed to raise $300 million ($100 million subordinated debt, $100 million stock sale, and $100 million convertible subordinated debentures). Donaldson, Lufkin & Jenrette proposed to raise up to $350 ($80 million from common stock, $100 million from convertible debentures, and $170 million from subordinated debt). The investment bankers' proposals relied on equity financing which petitioners could not do.

Petitioners contend that the debt to equity ratios in their loan agreements with the banks were not important because they were waivable. We disagree. Even if a term in the written agreements could be waived, that does not make that term unimportant.

Petitioners contend that RBC, TDB, and FNBC would have lent them $975,153,806. Petitioners rely on DeGroote's testimony that he had good relations with those banks. DeGroote testified that commercial lenders inundated LTL with offers to lend petitioners funds and that RBC, TDB, and FNBC had banking relationships with LTL. His general testimony on this point does not convince us that they would have lent petitioners as much as LIIBV did.

Haworth testified that petitioners could have borrowed money from commercial lenders based on petitioners' regular contacts with LTL's banks. Rademacher and Jacobs testified that they would have lent as much money to petitioners as LIIBV did. The

objective evidence does not corroborate their testimony on this point. Petitioners' loans from commercial banks totaled much less than $975,153,806, and were on terms substantially less favorable than the agreements accompanying petitioners' advances from LIIBV.

Petitioners could have borrowed some money from outside lenders. However, we do not think that they could have borrowed $975,153,806, or that they could have done so on terms close to the favorable terms that they received from LIIBV. This factor supports treating the LIIBV advances to petitioners as equity.

12. The Extent to Which the Recipient Used the Advance To Acquire Capital Assets

A corporation's use of cash advances to acquire capital assets suggests that an advance is equity. Estate of Mixon v. United States, 464 F.2d at 410. Use of an advance by an ongoing business to expand its operations, e.g., by acquiring an existing business, suggests that the advance is equity. Plantation Patterns, Inc. v. United States, 462 F.2d. at 713-716, 722; Tyler v. Tomlinson, 414 F.2d. at 846, 848-849.

Petitioners used most of the advances from LIIBV to expand their operations, especially by acquiring other companies, e.g., GSX. Petitioners told Canadian tax authorities that LTL's advances to U.S. subsidiaries through LIIBV were capital investments which formed a part of the subsidiaries' permanent capital.

Petitioners contend that this factor applies only to capital expenses for the initial operations of a business. Petitioners rely on Slappey Drive Indus. Park v. United States, supra at 583. Most of the advances in that case were used to finance the initial operations of a business. Id. However, the Court of Appeals for the Fifth Circuit did not hold in that case that an advance must be used to buy capital assets for a new business for it to be treated as equity.

This factor supports treating the LIIBV advances to petitioners as equity.

13. Whether the Recipient Repaid the Funds on the Due Date

The failure of a corporation to repay principal amounts on the due date indicates that advances were equity. Estate of Mixon v. United States, supra; see Slappey Drive Indus. Park v. United States, supra at 582. LIIBV repeatedly deferred and extended the vast majority of principal payments.

Petitioners contend that extending the due date is the same as repaying on the due date. Petitioners cite Litton Bus. Sys. Inc. v. Commissioner, 61 T.C. 367 (1973), and C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. at 657. Those cases differ from the instant case. Litton Bus. Sys. Inc. v. Commissioner, supra, differs because in that case the recipient of funds continuously repaid principal which substantially reduced the net debt. Id. at 374-375, 380-381. In Litton Bus. Sys., we found a reasonable expectation of repayment not present in the instant cases. Petitioners' account balances increased throughout the

years in issue, and LIIBV continued to make advances to petitioners despite their eroding financial conditions and their inability to repay the advances outstanding within a reasonable time period. See Atlanta Biltmore Hotel Corp. v. Commissioner, 349 F.2d 677, 680 (5th Cir. 1965), modifying and affg. T.C. Memo. 1963-255; Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 732 (3d Cir. 1963), affg. T.C. Memo. 1962-132; American-La France-Foamite Corp. v. Commissioner, 284 F.2d 723, 724-725 & n.3 (2d Cir. 1960), affg. T.C. Memo. 1959-101.

In C.M. Gooch Lumber Sales Co. v. Commissioner, supra at 657-659, the parties had an arrangement which provided for mutually offsetting business dealings, but assured repayment of principal. We found that until June 1960 the advances were debt, but after that date, repayment was unlikely and the advances were equity. Id. Here, there was no assured repayment during the years in issue.

This factor supports treating the LIIBV advances to petitioners as equity.

E.   Other Factors

     1.   Issuance of Debt for Cash

Petitioners contend that the fact that Transit, Tree, and LWSI transferred cash to LIIBV instead of stock supports treating the LIIBV advances to petitioners as debt. Petitioners cite Commissioner v. John Kelley Co., 146 F.2d 466, 469 (7th Cir. 1944) (debentures sold to shareholders in exchange for credit of dividends paid were not debt), revg. 1 T.C. 457 (1943), revd. 326

U.S. 521 (1946). We disagree. The Court of Appeals for the Seventh Circuit held in Commissioner v. John Kelley Co., supra, that the fact that the taxpayers did not exchange cash for debentures is a factor indicating that an advance is equity. Id. at 467. However, the Court of Appeals for the Seventh Circuit did not state that the converse is true; i.e., that if the recipient of funds received any cash, the transaction is a loan. The fact that LIIBV transferred cash to petitioners is not convincing evidence that the advances were debt.

This factor is neutral.

2.    Reasonable Expectation of Repayment

A reasonable expectation of repayment by the provider of an advance when the advance is made suggests that the advance is debt. Gilbert v. Commissioner, 248 F.2d 399, 406 (2d Cir. 1957), remanding T.C. Memo. 1956-137; C.M. Gooch Lumber Sales Co. v. Commissioner, supra at 656; Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441. Petitioners contend that LIIBV reasonably expected petitioners to repay all of the loans based on their financial conditions. We disagree. LIIBV's directors did not expect to be repaid or intend to request repayment.

This factor suggests treating the LIIBV advances to petitioners as equity.

3.    Absence of Conversion Rights

Petitioners point out that they had no right to convert the creditor's loans to stock of the debtor, and contend that this

suggests that the advances were not equity, citing Rev. Rul. 83-98, 1983-2 C.B. 40; Notice 94-47, 1994-1 C.B. 357; Notice 94-48, 1994-1 C.B. 357. This factor is not significant because LTL owned and controlled petitioners and LIIBV. LTL had the power to cause LIIBV to convert advances to petitioners to stock.

This factor is neutral.

F.   Conclusion

The factors that relate to the form of the transaction support treating the LIIBV advances to petitioners as debt. The factors relating to substance support treating the LIIBV advances to petitioners as equity. The substance of the transactions is revealed in the lack of arm's-length dealing between LIIBV and petitioners, the circular flow of funds, and the conduct of the parties by changing the terms of the agreements when needed to avoid deadlines. The Laidlaw entities' core management group designed and implemented this elaborate system to create the appearance that petitioners were paying interest, while in substance they were not.

We conclude that, for Federal income tax purposes, the advances from LIIBV to petitioners for which petitioners claim to have paid the interest at issue are equity and not debt. Thus, petitioners may not deduct the interest at issue for 1986, 1987, and 1988.

To reflect concessions and the foregoing,

<u>Decisions will be entered under Rule 155.</u>